- ILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

99 SEP 28 AM 9: 30

U.S. DISTRICT COURT
N.B. OF ALABAMA

NORA E. RIDDLE,                                )
                                               )
            Plaintiff,                         )
                                               )
v.                                             ) CIVIL ACTION NO. 88-PWG-5512-NE
                                               )
CERRO WIRE & CABLE GROUP, INC.,                )
                                               )
            Defendant.                         )

**ENTERED**

SEP 2 8 1999

MEMORANDUM OF DECISION

Background

        In 1976 Francis J. Roderick[1] was transferred from the Cerro Wire Maspeth, New

York, Plant to Hartselle, Alabama where he assumed responsibilities as plant manager for a wire

production facility.  The Hartselle operation was a start up project with no employees on site when

Mr. Roderick arrived.  In November of 1978, after her previous employment as a waitress and a

nurse's aide, Nora Elaine Riddle was hired by the Cerro Wire and Cable Group in Hartselle.[2] Ms.

Riddle was initially assigned to the packaging department on the second, or 3:00 to 11:00 p.m., shift.[3]

In the packaging department workers operated machines which wound wire products on to reels,

stacked wire product pallets, loaded and unloaded trucks often by using a forklift.  Ms. Riddle

---

[1]    Court's Exhibit #1. Mr. Roderick's March 2, 1988 deposition identifies the deponent as William J. Roderick. The parties agree, however, that Francis J. Roderick was the plant supervisor at Cerro Wire's Hartselle, Alabama facility during the period at issue. Indeed, the March 2, 1988 deposition identifies the deponent as Francis J. Roderick despite the name noted in the caption. (*See* Court's Exhibit #1, p.5).

[2]    Ms. Riddle was referred to throughout her employment as Elaine Riddle rather than Nora Riddle.

[3]    Packaging was also known as the "O8" department in 1978 and, later the designation was changed to the "585 department."

performed all of the jobs in the department including operating the forklift. When Ms. Riddle worked in the packaging department, Gary Taylor was a second shift supervisor at the Hartselle facility.

In the 1980-1984 time period department heads reported to Mr. Roderick as plant manager. In addition to department heads, the plant also employed shift supervisors. Department head and shift supervisor were considered management positions. Most departments also had an employee on each shift designated as a "lead person" sometimes referred to as a "utility operator." The lead workers were expected to perform the same basic tasks as their co-workers and were additionally charged with the responsibility of ensuring that work assigned to the department was completed. This usually required directing or organizing the work of co-employees on the same shift. The "lead person" was not a manager in that a lead worker could not hire, fire or even discipline a co-employee. The lead worker was required to report infractions of rules or other inappropriate conduct to supervisory personnel for disciplinary action. As such, the lead person was wholly dependent upon shift supervisors and other managers to enforce discipline. The lead person coordinated work activities and implemented the instructions of the supervisors. Leads were paid more per hour than non-leads on a given shift.

In March of 1980 after Ms. Riddle had worked in the shipping department for approximately two years, her lead person, Paulette Taylor, took six weeks of maternity leave. Gary Taylor, the supervisor, asked Ms. Riddle if she would serve as "acting" or "temporary" lead person in Ms. Taylor's absence.[4] When Ms. Riddle agreed to accept the acting lead position in packaging, Gary Taylor called the second shift together to tell the other workers that "she [Riddle] takes over

---

[4]     Gary Taylor is not related to Ms. Paulette Taylor.

2

for Paulette Taylor ...." No additional plant-wide notice of the temporary lead assignment was made. Ms. Riddle served as temporary second shift lead in packaging until Ms. Taylor's return.

Not long after Paulette Taylor returned to the packaging department and reassumed her role as lead person, Ms. Riddle was transferred to the shipping department. Among the duties of the shipping department was to "pull" orders for shipment to customers. The instructions for "pulling" and preparing orders for shipment involved, among other things, the use of "IBM tickets." It is significant that during the early 1980s activity in the Hartselle plant increased substantially with the closing of a similar production facility in New York. When Cerro's parent group closed the Maspeth facility, new production equipment was transferred to Hartselle. As a consequence, in 1981-1982 the Alabama plant began to ship twice as much wire product as it had earlier in its history. This increase in production and shipping meant that new workers were hired and required training. The lead person on each shift would often train the new employee.

By January of 1983 Ms. Riddle had worked in the shipping department for approximately eighteen months. It is undisputed that Ms. Riddle had become the most senior employee on the second shift in shipping. Ms. Riddle learned that the second shift lead worker position would soon be open in the department. She also had heard that another employee with less time in service with the shipping department, Scott McCoy, would be named lead person. Ms. Riddle went to Gary Taylor to ask whether McCoy was to be made the second shift lead. Taylor told her that she would be the lead.[5] In February of 1983 James "Buck" Harvell was hired on the second shift in the shipping department. In April of 1983, Scott McCoy was promoted to foreman of the loading

---

[5]      The nature and function of Ms. Riddle's tenure as a "lead" is disputed. It is not disputed, however, that most employees, including those in shipping, other departments and even management, were under the under the impression that Ms. Riddle was a lead worker by some definition in 1983.

3

docks and left the shipping department. In May of 1983 Willie Ray Sharply was hired to work in the shipping department. Sharply, who remained at Cerro only until July of 1983, was introduced to Ms. Riddle by Mike Ward, a personnel director, as the second shift "lead person." Paul Ferguson, also hired in 1983, was told by Gary Taylor that he would be working for Elaine Riddle. In February of 1983 Gary Taylor held a meeting with "the men."[6] Ms. Riddle was present when Taylor told the workers that they might not like taking orders from a woman but that he had placed her [Riddle] there because she could do the job and had been there the longest. Taylor told the workers that if Riddle told them to do something "it was like it was coming [his] mouth." Other than this meeting there was no posted notice or other published indication that Ms. Riddle was to be a lead worker on the second shift of the shipping department although such promotions were generally posted.

Ms. Riddle was assigned the same general duties of each worker on the shift. In addition, she sought to execute the instructions of supervisor. She was required to review the orders and "IBM tickets" in organizing the work of the shift. She made regular trips to the post office and, on occasion, she was required to meet other Cerro employees at the airport to transport them to Hartselle. Reviewing the IBM order tickets sometimes meant Ms. Riddle would be away from the shipping department to meet with Pat Couch, the second shift lead in packaging. Ms. Couch is Ms. Riddle's sister.

As early as March 1983 Ms. Riddle asked Taylor about a pay raise to compensate her for work as a lead person. The issue remained unresolved in late June and early July of 1983 when Ms. Riddle took a vacation. In her absence, James "Buck" Harvell served as acting lead worker.

---

[6]     From the record it would appear that the second shift crew at that time consisted of Scott McCoy, James "Buck" Harvell, Marty Rylant, and perhaps John Steele. Ray Sharply and Paul Ferguson were employed on the second shift sometime after February of 1983.

4

When Ms. Riddle returned to the Cerro plant in July, a union organizing effort was under way. The company opposed unionization and campaigned openly against a pro-union vote. During this period, Ms. Riddle asked Gary Taylor whether she could vote in the upcoming union election. Taylor and second shift supervisor Nathan Fletcher told Ms. Riddle that she could vote because while they viewed her as a lead person, she was not an "official lead person." Upon learning that she was not an "official" lead person Ms. Riddle went to plant manager Roderick. Mr. Roderick reviewed Ms. Riddle's personnel file with her and noted that there was no record of a promotion to lead person nor a request for a pay raise from Gary Taylor. Roderick said that he would talk with Taylor. Later, Nathan Fletcher told Ms. Riddle that because of the union activity the company could not give raises, promotions or appoint lead workers. At about this time, Ms. Riddle began to wear pro-union T-shirts and speak out in favor of a pro-union vote. She also continued her role on second shift in the shipping department. In October 1983, Ms. Riddle applied for a loan from a mortgage company. In response to a request for employment verification submitted by the mortgage company to Cerro Wire, an unidentified person at Cerro Wire wrote that Elaine Riddle was a lead person on second shift in shipping and that her continued employment prospects were good.

Throughout 1983 there were complaints from other departments concerning the work performance of the shipping department. On at least one occasion Ms. Riddle learned that complaints concerning her department on a particular Friday night had been reported to Mr. Roderick. She went to Roderick to discuss the matter. Roderick expressed to Riddle his disappointment in the performance of the shipping department. In addition, on other occasions Ms. Riddle told Gary Taylor that she had heard about complaints. Taylor told Riddle not to worry about complaints unless he came to her about them.

5

In the Fall of 1983, several men on the second shift were throwing a ball made from packaging tape. The ball struck Ms. Riddle. Horseplay, such as playing ball, was deemed a safety hazard and a violation of company policy. Ms. Riddle reported the ball-playing incident to Gary Taylor first through second shift supervisor Fletcher and in person the following day. Taylor told Riddle that if she saw the men playing ball she should "get in there and play ball with them a little bit." Sometime later, however, Taylor met with the second shift workers. Ms. Riddle was not present at this meeting. It was reported to Riddle that Taylor had said that playing ball on breaks and during lunch was acceptable if the men "didn't get caught." Ms. Riddle concluded that the problems in the shipping department which resulted in complaints from other departments arose after the men learned in July of 1983 that she was not an "official" lead person. She also concluded that Nathan Fletcher and Gary Taylor had failed to properly "back her up" in disciplinary matters, including Nathan Fletcher's handling of an October 1983 incident in which John Steele refused to follow Ms. Riddle's instructions in addition to Taylor's consideration of the ball playing incident. In late 1983, apparently because of complaints, Roderick sent Bob Eddy, a third shift supervisor, to review and report on the shipping department. Eddy told Riddle that he would observe the work and report to Roderick. He also told Riddle that he would not tolerate any failure of the workers to follow her instructions.

In January of 1984, a promotion to lead person in shipping was an agenda item for Mr. Roderick, Mike Ward–the personnel director, Bob Eddy, Gary Taylor, Nathan Fletcher and the production manager at the facility.[2/] Elaine Riddle and James Harvell were considered as the candidates for the second shift lead position. Harvell was selected. After the announcement of Harvell's selection Riddle spoke with Mr. Roderick. Roderick told Riddle that she was not selected

---

[2/]     Taylor was scheduled to enter the hospital for surgery.

because she could not get along with other people and other leads. Roderick told her that he had made the decision to appoint Harvell as the lead person because he believed Harvell would do a better job.

On March 16, 1984 Ms. Riddle filed a complaint with the Equal Employment Opportunity Commission. In her complaint Ms. Riddle maintained that she had been passed over for promotion to lead person in shipping and receiving on January 26, 1984. She acknowledged that she had been told by Frank Roderick that she had not been promoted to lead person "because I was not getting the work done; because I had a bad attitude; and because he believed that the person selected for the position could do a better job." (Plaintiff's Exhibit 1). Ms. Riddle also stated that the February 1983 meeting in which Taylor told the men that she was to be lead person was discriminatory. She further alleged that in October of 1983 Nathan Fletcher had failed to discipline John Steele when Steele was insubordinate. Ms. Riddle told the EEOC that Mr. Fletcher had merely given Steele a verbal warning. Ms. Riddle reported that in November of 1983 she told Gary Taylor that Steele, Buck Harvell, Marty Rylant and Paul Ferguson were engaging in horseplay. She informed the EEOC that Taylor had spoken to these men but that when the four left Taylor's office they were "laughing." Ms. Riddle noted that the company disciplinary policy called for a verbal warning, a written warning and a suspension preceding discharge. She also informed the EEOC that Steele had received a previous warning while working in another department. Ms. Riddle contended that the appointment of Buck Harvell was discriminatory because Harvell had "no experience as a supervisor." She also noted that Harvell had received a pay increase with his promotion. Ms. Riddle's complaint stated that "the employer allowed my subordinates to violate rules and would not discipline them because I am female. It is my belief that similarly situated male employees are backed

7

up by the employer in performing their duties. It is my contention that the reasons given for failing to promote me and failing to pay me wages for duties performed is [sic] a pretext." (Plaintiff's Exhibit 1). In an April 1984 reply to the EEOC complaint, Cerro Wire, through its attorney, noted that three of the five employees promoted to lead positions in January of 1984 were women. In the reply Cerro's attorney also wrote that "Gary Taylor specifically denies ever making her a lead person or a temporary lead person or promising her that she would be one. Rather, Riddle has been and continues to be a shift coordinator. Taylor also denies ever saying to employees, ' I know she [Riddle] is a woman and you might not want to take orders from her, but she has been placed in the position [lead person] because she has worked here for a long time and she knows the job.'" (Plaintiff's Exhibit #3). In an affidavit submitted to the EEOC in September of 1985, however, Gary Taylor stated that in 1983 he had given lead responsibility to Elaine Riddle because of her experience and because all other employees in the shipping department at that time were trainees. He also said in the affidavit that through his later observation he learned Jerry "Buck" Harvell was a better worker than Elaine Riddle. He said that a lead person must have good work performance, leadership qualities and that seniority could be a factor. Taylor's affidavit stated that during the time period Elaine Riddle was working as a lead person she was abusive to fellow employees and a poor communicator. (Plaintiff's Exhibit #14).[9/]    After the complaint was filed, EEOC and Cerro Wire engaged in substantive discussions of the allegations and reached an accord which resulted in an August 25, 1988 entry of a consent decree. (Defendants' Exhibit #45). Ms. Riddle, however, continued to pursue her

---

[9/]    In his April 19, 1999 testimony before the court Mr. Taylor stated that the affidavit had been prepared by an EEOC investigator and that he signed it.

individual claims.[9/] After the lawsuit was filed in 1988, Ms. Riddle remained an employee of Cerro Wire. In 1990 Ms. Riddle sought and received appointment to an office position as a data entry clerk. In order to increase her typing skills, Ms. Riddle enrolled in a ten-week typing course in the fall of 1990. Ms. Riddle provided a certificate of completion to her supervisor Glen Slovick in 1991. It was the policy of Cerro Wire to reimburse employees who had taken educational courses related to their work upon the receipt of proof of completion. When Ms. Riddle was not reimbursed for the typing course she spoke with a vice-president by the name of Rackland. Rackland told Ms. Riddle that she should provide him a copy of the certificate of completion. Ms. Riddle was at that time unable to locate her copy of the certificate and had no further contact with Rackland. After Jay Whittington became director of personnel, Ms. Riddle again raised the question of the $45 reimbursement due her for the completion of the typing course. Whittington told Ms. Riddle that he did not have a copy of the certificate of completion. In 1994, during discovery proceedings in this litigation a copy of a certificate of completion was found in Ms. Riddle's personnel file.

After Ms. Riddle began work as a data entry clerk she received a performance review in 1991 from her supervisor, Ms. Pat Lott. Ms. Lott's performance review was followed by another review in 1992 when Glen Slovick became Ms. Riddle's supervisor. Ms. Riddle felt that the 1992 evaluation was discriminatory , among other things, because there was a criticism of her excessive talking during work hours. The 1992 evaluation also resulted in a pay increase of 4% although an increase of 4.8% had been noted and "whited out." A 1993 review was written by Ms. Riddle's supervisor, Mr. Ron Welch. The evaluation reduced performance assessments in certain categories

---

[9/]     Whether Ms. Riddle could pursue her individuals claims against Cerro Wire resulted in protracted litigation in both the district court and the Eleventh Circuit Court of Appeals. This collateral litigation was the cause of some, but not all, of the extraordinary and inexcusable delay in the resolution of this law suit.

from good to average. The 1993 pay increase received by Ms. Riddle, however, was consistent with that of other employees. Ms. Riddle remained an employee of Cerro Wire in Hartselle, Alabama at the time of the trial.

### GENERAL PRINCIPALS OF LAW

This is a disparate treatment circumstantial evidence Title VII action arising from a failure to promote Elaine Riddle to lead worker because of her gender.[10] In *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) the Supreme Court established the now-familiar frame work of burdens of proof that a Title VII plaintiff must satisfy to obtain judgment in her favor if she possesses only circumstantial evidence of discrimination. Under *McDonnell-Douglas*, a Title VII plaintiff must first establish a *prima facie* case of intentional discrimination. *See McDonnell-Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. A valid *prima facie* creates a presumption that discrimination has occurred. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997), *cert. denied, sub nom Combs v. Meadowcraft Co.,* ___ U.S. ___, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). In *McDonnell-Douglas,* a racial discrimination case, the Supreme Court stated that a plaintiff may establish a *prima facie* Title VII case by showing

    (i)     that he belongs to a racial minority;
    (ii)    that he applied for and was qualified for a job for
            which the employer was seeking applicants;
    (iii)   that despite his qualifications, he was rejected;
    (iv)    that, after his rejection, the position remained open
            and the employer continued to seek applicants from
            persons of complainant's qualifications.

---

[10]    It is important to note the cause of action and the method of proof for reasons that are more fully explained below.

*McDonnell-Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.

The standard was tailored to the particular case at hand, in which there was no showing that the defendant employer had hired anyone for the position sought by the Title VII plaintiff. In *Crawford v. Western Electric Company*, 614 F.2d 1300, 1315 (5th Cir. 1980) the Fifth Circuit Court of Appeals added an alternative to the fourth element of the *McDonnell-Douglas* standard to address the situation in the place in which the plaintiff "loses out" to another applicant in competition for promotion holding that:

> [P]laintiffs may establish a *prima facie* violation by showing that they are members of a group protected by Title VII, that they sought and were qualified for a position that [the defendant's employer] was attempting to fill, that despite their qualifications they were rejected, and that after their rejection Western Electric either continued to attempt to fill the positions or in fact filled the positions with [persons outside the plaintiff's protected class].

*Id.*

If the plaintiff successfully establishes a *prima facie* case, a legal presumption of unlawful discrimination arises and the burden shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for the challenged employment action. "To satisfy that burden of production, '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against plaintiff.'" *Combs*, 106 F.3d at 1528 (*quoting Burdine*, 450 U.S. at 254-55, 101 S.Ct. at 1094). If the employer meets this burden of production "[t]he presumption, having fulfilled its role in forcing the defendant to come forward with some response, simply drops out of the picture." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510-11, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407

(1993). In order to establish a *prima facie* case of discrimination Ms. Riddle is not required to prove that her qualifications were superior than those of James "Buck" Harvell. *Walker v. Mortham*, 158 F.3d 1177, 1192 (11th Cir. 1998). The burden of articulating relative qualifications rests with the employer, not the employee. Although a plaintiff may be required to address relative qualifications if the defendant presents the question to rebut plaintiff's presumption of discrimination, the plaintiff need not introduce evidence regarding relative qualifications before then, she need only prove that she herself was qualified to perform the coveted job. *Walker*, 158 F.3d at 1193.

To satisfy its burden the defendant must raise "a genuine issue of fact as to whether it discriminated against the plaintiff" by making that decision. *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094. In other words, "the defendant must clearly set forth, through the introduction of admissible evidence, the reason for its adverse employment decision," and that the reason "must be legally sufficient to justify a judgment for the defendant." *Id.*, *see also Trotter v. Board of Trustees of the Univ. of Ala.*, 91 F.3d 1449, 1455 (11th Cir. 1996). Once the defendant meets its burden of production the presumption of intentional discrimination drops from the case and the plaintiff must persuade the trier of fact that the defendant intentionally discriminated against her despite the defendant's assertion of lawful reasons for the challenged employment action. *See Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094, 1095; *Combs*, 106 F.3d at 1528 (*citing McDonnell-Douglas*). In carrying the ultimate burden Ms. Riddle may discredit the employer's proffered explanation. *Clark v. Coates & Clark, Inc.*, 990 F.2d at 1228. Under this approach Ms. Riddle may demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered reasons for its actions that a reasonable fact finder could find [all of these reasons]

unworthy of credence." *Combs v. Plantation Dalton*, 106 F.3d at 1538 (internal quotation marks and citations omitted).

## GENERAL STATEMENT OF ISSUES PRESENTED

Ms. Riddle contends that she was not promoted to lead person for the second shift in the shipping department at Cerro Wire's Hartselle facility in January of 1984 because Gary Taylor improperly viewed her sex as a negative factor in the decision to promote Jerry "Buck" Harvell. Ms. Riddle also contends that Cerro Wire through her supervisors in data processing retaliated against her because she had complained to the EEOC of sex discrimination by refusing to reimburse her for a typing course, writing two unfair employment reviews and reducing a proposed pay raise from 4.8% to 4% in 1992.

Ms. Riddle stated that only Gary Taylor discriminated against her but that management failed to support her while "acting lead" which inevitably lead to her problems in achieving the necessary performance in the shipping department. Ms. Riddle has alleged that had she been a man she would have received adequate backing by management. The managers Ms. Riddle alleges failed to support her were Gary Taylor and Nathan Fletcher. Ms. Riddle also contends that Gary Taylor failed to follow company rules concerning discipline and that that failure to follow rules is evidence of discrimination. Ms. Riddle argues that while Frank Roderick was the ultimate decision-maker, the presence of Gary Taylor in the decision-making process "infected" the job selection procedure.

As an evidentiary matter Ms. Riddle argues that because the company's response to the EEOC inquiry initially quoted Taylor as denying Ms. Riddle had ever been made an acting lead and later Taylor "admitted" telling Ms. Riddle she would be a lead person in some form, the

13

contradiction is either "proof of discrimination" or impeachment sufficient to warrant rejection of the company's articulated reasons for promoting Harvell rather than Ms. Riddle in January 1984.

Cerro Wire argues that Elaine Riddle was not promoted to second shift lead for legitimate, non-discriminatory reasons. In her complaint to the EEOC Ms. Riddle told the Commission that she had been told by Roderick that she "... was not promoted to a lead person position because [she] was not getting the work done; because [she] had a bad attitude; and because he believed the person selected for the position could do a better job." (Plaintiff's Exhibit 1). At trial Ms. Riddle also testified that Roderick told her that Harvell "got along with people better and could do the job."[11] Ms. Riddle also stated that on cross-examination Roderick told her that she "... could not get along with people and other leads and that Harvell could get along with other leads." The court admitted the EEOC's response of Cerro Wire generally under the authority of Federal Rule of Evidence 401. The company's reply to the EEOC will be considered together with other evidence.


Evidentiary Consideration

The parties, and particularly trial counsel, in this action labored under an extraordinary hardship in that the disputed employment action took place more than fifteen years before this case was tried to conclusion. While a complete post-mortem recounting of the causes for delay provides little benefit, there is no question that this court has contributed more than its share to the problem. One practical effect of delay on the trial of this case is a predictable erosion of memory. Witnesses,

---

[11] Quotation marks referring to trial testimony are intended to identify specific statements as distinguished from inferences that might be drawn from the statements. The quoted portions from trial testimony, however, are from the court's trial notes and are not intended to suggest that the cited portions are a verbatim record of the proceeding.

noticeably Gary Taylor, had or feigned having virtually no recollection of the events. During Taylor's direct examination, counsel for Ms. Riddle was required to refer frequently to Taylor's 1988 deposition. Initially the deposition excerpts were offered as "prior statements" under Federal Rule of Evidence 613 and used to refresh Mr. Taylor's recollection under Rule 612. Later when Taylor was examined by Cerro Wire's attorney, the excerpted portions of the deposition were offered as substantive evidence under Federal Rule of Evidence 803(5). The parties jointly agreed to the introduction of the deposition portions read into the record as substantive evidence although they did not agree to admit the entire 1988 deposition. During the testimony of other witnesses, for example Billy Ray Eddy, the phrase "refresh recollection" was utilized by both parties. It is assumed by the court, however, that the parties intended for the deposition portions read into or referred to in the record to be considered as substantive evidence unless subject to a specific objection. Moreover, the depositions of Francis J. Roderick were admitted by agreement with the reservation of each party to object to discrete portions. Those objections are considered below or in the margins.

Ms. Riddle has not suggested that the record contains direct evidence of a discriminatory motive on the part of the decision-makers in this action. She has referred to at least two distinct types of circumstantial evidence based upon statements and comments of employees of Cerro Wire. This evidence requires proper placement in the decision-making schematic by which the plaintiff's case is resolved. Direct evidence, of course, if believed by the fact finder proves the existence of discriminatory intent without inference or presumption. *EEOC v. Alton Packaging Corp.*, 901 F.2d 920 (11th Cir. 1990) (General racially discriminatory remarks can constitute direct evidence of decision-maker's failure to promote black employees for discriminatory reasons.). When these statements are attributable to the decision-maker, the trier of fact "accepts the ultimate issue

15

of discrimination is proved." *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11th Cir.), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984). When such a finding is made "the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the [illegitimate criterion] into account." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989). Circumstantial evidence of discrimination does not require the defendant to shoulder an additional burden of proof. Statements, even statements of decision-makers which merely suggest a discriminatory motive are by definition circumstantial evidence. *Evans v. McClain of Georgia, Inc.*, 141 F.3d 957, 961 (11th Cir. 1997) ("These statements ... however inappropriate they may be are not direct evidence of a discriminatory motive with respect to the appellate's claims of failure to promote ....")

Ms. Riddle cited Gary Taylor's preamble to his February 1983 "speech to the men" concerning her role as a lead person as circumstantial evidence from which a discriminatory motive may be inferred. Ms. Riddle has also produced evidence, although somewhat internally contradictory, which suggests that some of her co-workers may have resented working for a woman. These latter comments are not attributed to Taylor nor any decision-maker. Assuming such statements were made, there is no suggestion that Taylor directly or indirectly ratified or approved of such attitudes or joined in them. The statements of co-workers "can still constitute evidence of the atmosphere in which the employment decision was carried out." *Ross v. Rhodes Furniture Company, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998), *quoting Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521 (3d Cir. 1997). Accordingly, in addition to the statements attributable to Taylor, those attributable to John

16

Steele by Marty Rylant and those of Paul Ferguson recounted by Bennie Self are considered as circumstantial evidence.

Finally, Ms. Riddle offered her performance evaluations prepared by supervisors after she left the shipping department. These reviews were admitted on the theory that the opinions of other supervisors were relevant to an examination of Taylor's expressed reasons for not promoting her. At the same time the court did not admit documents offered by Ms. Riddle concerning Harvell's performance as a lead person after his selection. The issue to be decided is whether at the time of the selection of Harvell the employer believed him to be capable of acting as a lead person not whether he proved to be a superior lead person after his selection. While post-selection reviews of Riddle which indicate that she was thought to be a good worker are relevant, disciplinary proceedings against Harvell are not.

Findings of Fact and Conclusions of Law

I.     The Promotion Claim

    A.     The EEOC Response

In her pretrial brief submitted to another judge of this court, Ms. Riddle outlined what she termed her "offensive theory." Ms. Riddle contends first that the reasons given by the company for not promoting her are proven false because the April 19, 1984 letter to EEOC stated that she was not a lead person and that Gary Taylor denied she had ever been an acting lead person when, in fact, she had served as a lead person. There is no question that the response provided to EEOC Investigator David West is presented in the following paragraphs:

> Regarding Ms. Riddle's allegations, her foreman, Gary Taylor, specifically denies ever making her a lead person or a temporary lead person or

17

promising her that she would be one. Rather, Riddle has been and continues to be a shift-Coordinator. Taylor also denies ever saying to employees, "I know she [Riddle] is a woman and you might not want to take orders from her, but she has been placed in the position [lead person] because she has worked here a long time and she knows the job.

Plant Manager Frank Roderick, was confronted by Riddle after the latter did not receive a promotion. This meeting probably occurred sometime earlier in 1984. She told Roderick that she believed that she should have been promoted to the job of lead person and Roderick told her she did not get the job because she was not the best candidate. He also told her that she believed she had problems dealing with people.

It is clear that the job was not discriminatorily awarded on the basis of sex because the job was awarded to a woman, Willadene Mullins. The male promoted to the position, Buck Harvell, was promoted because in the short time he had worked for Cerro, he demonstrated an outstanding work record and was recommended by several managers.

The company further denies allegations contained in the charge suggesting that supervisors Taylor and Fletcher discriminatorily implemented disciplinary policies. Finally, the company denies that Buck Harvell was trained solely by Riddle or solely by any other person.

(Plaintiff's Exhibit #3, admitted over defendants' objection).

Ms. Riddle cites *Starks v. George Court Co., Inc.*, 937 f.2d 311, 314 (7th Cir. 1991) for the proposition that such a denial, prepared by counsel, is proof that the company's proffered reasons should be determined to be pretextual. In *Starks*, the court found that in response to the EEOC inquiry the company first said that the plaintiff had been fired because he had failed to follow

18

instructions of his foreman then later claimed that the plaintiff had not been fired but had been laid off because of a work shortage. At trial the defendants offered a third version of events claiming that the plaintiff was neither fired nor laid off but had actually quit his job.[12] The Seventh Circuit simply acknowledged that the district court had properly relied upon such evidence in concluding that the reasons offered to explain plaintiff's departure at trial were unworthy of belief. In contrast, in this case all evidence which set out the defendant's reasons for promoting Ms. Riddle except the response to the EEOC consistently reinforce the same core information.[13]

In her EEOC complaint Ms. Riddle stated that on the day Harvell's promotion was announced "Frank Robert [sic], plant manager, told me I was not promoted to a lead person position because I was not getting the work done; because I had a bad attitude; and because he believed the person selected for the position could do a better job." At trial Ms. Riddle testified that after the selection Mr. Roderick told her that "... he thought Harvell got along better and could do a better job."

In addition to the testimony of Ms. Riddle and the initial complaint to EEOC, the company's articulated reasons for promoting Harvell are consistent with the testimony of Mr. Roderick, Mike Ward, Nathan Fletcher, and the deposition of Gary Taylor, as well as his affidavits provided to EEOC investigator West. There is no question that Ms. Riddle was at the very least an acting lead person from January 1983 until Harvell's appointment in January 1984. Statements to

---

[12]     *Starks* was decided against a backdrop of blatant and pervasive racial hostility and discrimination. *See Starks,* 937 F.2d at 313.

[13]     At trial Cerro Wire's counsel suggested that as a young lawyer he had not investigated as completely the initial charge as he would today prior to preparing the response. This is one of the few cases in which an attorney might be young and inexperienced at the inception of the litigation and very experienced at the conclusion. Nonetheless the court does not find that there is <u>evidence</u> to explain the contradiction between the EEOC response and virtually all of the other evidence.

the contrary are simply wrong.  When the evidence is evaluated, the EEOC statement to the contrary is wholly inconsistent with substantial evidence produced by both parties that Ms. Riddle was specifically told in January of 1984 why Harvell was promoted and she was not.  As most of the company's EEOC response is consistent with the reasons given to Ms. Riddle for the promotion of Harvell the court finds that the EEOC response is a simple mistake which does not warrant the conclusion that the company falsely stated its reasons for promoting Harvell.[14]  While the fact that Ms. Riddle may or may not have been a lead person or temporary lead person is relevant, the principle question is why Mr. Harvell was promoted to permanent full time lead person over Ms. Riddle. Those reasons are corroborated not only by the defense witnesses but by the EEOC response itself, Ms. Riddle and the statements of Gary Taylor made to the EEOC investigator.  As a matter of fact the court finds that the EEOC response does not suggest that the proffered reasons were false or unworthy of belief.

B.    The Employer's Articulated Reasons for Not Promoting Ms. Riddle

Ms. Riddle acknowledges that on the day Buck Harvell was selected she was told that she was not getting the work done, she had a bad attitude and that Harvell could do a better job. During the EEOC investigation Gary Taylor told the investigator that while Ms. Riddle served as a temporary lead worker, she was "abusive to fellow employees and a poor communicator."  Taylor told the investigator that to be a lead person an employee "... must have: (1) good work performance; (2) leadership qualities; and (3) seniority."  (Plaintiff's Exhibit #14).  As an initial issue, Ms. Riddle

---

[14]     The response to EEOC does not affirmatively indicate that the person preparing the response ever spoke to Taylor before the document was sent to the agency.

has contended that Cerro Wire may not rely upon certain factual information concerning her problems with other lead workers in support of the proffered reasons because the only evidence that Ms. Riddle had such difficulties with other employees or other leads came primarily from her own testimony. As a matter of fact, this position is simply wrong. She further asserts incorrectly that the only evidence of complaints came from the testimony of Carolyn Smith and Willodean Mullins and that otherwise "[there] was a complete failure on the part of defendants to show that the complaints about Ms. Riddle were made either to Taylor or Roderick." There is substantial evidence that complaints were made to Taylor, Fletcher and Roderick throughout 1983. There is also substantial evidence that Ms. Riddle's difficulties with other employees was well known at Cerro Wire. The court considers the testimony of witnesses as follows.

(1)    <u>Testimony of John Steele</u>

John Steele, an employee on the second shift in the shipping department, testified during plaintiff's case that he himself had "complained to Taylor about Elaine not being around [in the shipping department]...." He also stated that "Patsy Smith did not like her [Riddle]. They fought over orders...." He testified that "day shift didn't like her either. There was tension...." He said that "Patsy would complain...." In answer to the question, "were complaints getting back to Taylor?" Steele testified "I imagine they were...."

(2)     Testimony of Marty Rylant

Marty Rylant, also a plaintiff's witness, testified that "there were problems getting orders out...." The "first shift made complaints...." Mr. Rylant acknowledged that "Patsy Smith complained...."

(3)     Testimony of Bennie Self

Mr. Self testified that "first shift complained [about the shipping department]...." Self further stated that "[Patsy] Smith, [Linda] Franks and [Willodean] Mullins complained about Riddle not being dirty at the end of the shift." He stated that "Patsy said Riddle could not have worked all night and not get dirty." Self stated that "first shift women had disagreements with Riddle...." He also testified that "Linda Franks and Riddle had problems...."

(4)     Testimony of Paul Ferguson

Paul Ferguson, also a second shift shipping department employee, testified that he had "heard talk about some of the women not liking Riddle...." He stated that he had heard "some of the older women would talk about Riddle not working...." He specifically said that "Carolyn Smith has some problems with Riddle...."

(5)     Testimony of Elaine Riddle

Ms. Riddle acknowledged that "a lot of nights the orders didn't get pulled because they [the other employees] didn't want to do nothing...." She stated that on at least one occasion "Patsy said Roderick was upset because the orders hadn't been pulled...." She confirmed that she had

22

been told about the complaints of other shifts when she acknowledged that "men on the crew told me about complaints. It was all of them at one time or another...." She even stated that "I went to Taylor about the complaints." She acknowledged that "Patsy and I talked once..." about the problems. She testified that "Patsy and I didn't have many disputes...."[15]

### (6)    Testimony of Billy Ray Eddy

Mr. Eddy testified that he was "told by Mr. Roderick to go back there.... There were problems with orders being pulled or not being pulled...." Eddy stated that he was "sent back there [to the shipping department] by Roderick and Ward...." He confirmed that there had been "complaints about Riddle being out of the department for a long time."

### (7)    Testimony of Mike Ward

Mike Ward, the personnel director, testified that "people would tell me that she was hateful and could not get along with others...." He said that there were "a lot of complaints about her." He stated that "Mattie Bennett complained about her.... They could not get along...." Ward said that "Willodean Mullins complained that she did not like her attitude and that she was hateful." He stated that at the time of the selection meeting "we were all asked [by Roderick] and I said what I had heard...."

---

[15]    As to this issue, Ms. Riddle's statement that she had "few" problems is not as credible as the evidence which demonstrates the problems to have been more widespread. *See Perry v. Johnson Products Company*, 698 F.2d 1138, 1144 (11th Cir. 1983); *Thompkins v. Morris Brown College*, 752 F.2d 558, 564 (11th Cir. 1985); *Equal Opportunity Commission v. Alton Packaging Corp.*, 901 F.2d 920, 924 (11th Cir. 1990).

### (8)    Testimony of Willodean Mullins

Ms. Mullins stated that she had told Gary Taylor that in her opinion Ms. Riddle wasn't "wasn't worth a s—...." Mullins told Taylor and others that "she [Riddle] didn't carry her load.... She didn't do nothing... just walked around...." Ms. Mullins testified that she "told Gary and Roderick this...." She stated that in her opinion Ms. Riddle "... didn't do nothing...."

### (9)    Testimony of Carolyn Smith

Carolyn Smith testified that she [Riddle] "carried a pad but didn't work...." Ms. Smith testified that she "complained to Gary Taylor about that...." Ms. Smith stated that "there were complaints ... I made complaints...."

Ms. Riddle has also suggested that Willodean Mullins and Carolyn Smith were unable to observe the operation of the shipping department and form a reasonable basis for this testimony. Each testified, however, that they had direct contact with Ms. Riddle and worked in the shipping department. Ms. Mullins stated that prior to being made a lead on first shift she would often work over into the second shift. She had a first hand opportunity to observe the shipping department, Ms. Riddle and Harvell. Ms. Smith stated she often worked twelve hour shifts which also crossed over into the second shift for four hours. The testimony relating the problems with Ms. Riddle and the shipping department came not only from Ms. Mullins and Ms. Smith but virtually every witness who testified. Accordingly, the court finds that there is substantial credible evidence that during the time Ms. Riddle served as a temporary lead person there were significant problems in the performance of

the shipping department and these problems were reported to Taylor, Fletcher, Mike Ward and Mr. Roderick.[16]

Ms. Riddle suggested at trial that Taylor's reference in his EEOC affidavit stating one of the qualities of a lead person -- the need for "being a good communicator"-- did not support the conclusion that her performance was deficient. Ms. Riddle offered testimony that her instructions to co-employees were clear. Willie Ray Sharply, for example, testified that he clearly understood the instructions from Ms. Riddle during the short period of time he worked in the shipping department. From the evidence it is apparent, however, that the term "communication" as used by the company and Ms. Riddle has a different meaning to each. Cerro Wire did not suggest that Ms. Riddle lacked clarity in her instructions. Cerro Wire employees responsible for her performance found that, without regard to the clarity of her instructions, Ms. Riddle failed to achieve the necessary performance. For example, Nathan Fletcher who has not been accused of gender discrimination by Ms. Riddle, testified that "Ms. Riddle had communication problems ... [in that] she wouldn't know how to tell them what to do in a way that would get it done." She would "rub people the wrong way." Fletcher stated that being a lead person required the ability to "communicate and get the men to do what is asked rather than threaten them with 'I'll carry you to the office.'" In the context in which the term

---

[16]  Plaintiff also contends that the testimony of Carolyn Smith was "impeached" because she was a signatory to a handwritten statement which read "I have had the knowledge for a long time that Elaine was a lead person, has been performing the job, and did a good job, the supervisor knew that she was a lead person, he told me many times that she was a lead person." (Plaintiff's Exhibit #5). This statement is signed by 13 employees including Carolyn Smith. It is not clear under what circumstances Ms. Smith signed the statement nor whether the reference to "doing a good job" was deemed by Ms. Smith to be important. It is clear however that she testified credibly in person that she did not believe Ms. Riddle performed adequately. The court accepts the in-court testimony subject to cross examination to be more believable than that of the signature appearing on plaintiff's exhibit #5. Plaintiff also suggests that Willodean Mullins' testimony was impeached because she told Taylor that Riddle was a poor worker well before the promotion. Clearly, however, Taylor knew from Mullins that Riddle did not do her work at the time he recommended Harvell regardless of when he learned it. Moreover, Ms. Mullins said she told Roderick about Ms. Riddle as well.

25

"communication" arises in the employment decision it is clear that the question is not whether or not Ms. Riddle's instructions were clear but whether she was able to induce the performance required.

Ms. Riddle has also suggested that the defendants failed to "counsel her" concerning the deficiencies in her performance and communication. Ms. Riddle cites *Vaughn v. Edel*, 918 F.2d 515 (5th Cir. 1990) for the proposition that the failure to counsel Ms. Riddle while presumably counseling other employees is evidence of intentional gender discrimination. *Vaughn* is inapposite even as persuasive authority. In *Vaughn* a superior of the plaintiff specifically instructed plaintiff's immediate supervisor not to criticize plaintiff's work performance because he did not want to make a "racial" incident out of a performance review. Because of the decision not to criticize plaintiff, her reviews and evaluations were inflated beyond plaintiff's actual performance in order to avoid a confrontation.    When a subsequent reduction in force occurred, plaintiff was selected to be discharged. Plaintiff alleged and proved that the act of failing to provide her counseling concerning her inadequate work performance was evidence of discrimination. Importantly, however, the plaintiff in *Vaughn* proved that the initial decision to treat her differently was motivated exclusively because of her race. That is, the district and appellate courts found direct evidence of discrimination. In Ms. Riddle's case there is no direct evidence of discrimination nor is there evidence of substantial deviation from the general practice of managers and supervisors at Cerro Wire. There is simply no evidence that prior to December 1983 performance evaluations were required for any employee, nor is there evidence that the disciplinary process which was in place served as a substitute for an evaluation or review mechanism. It is true that at least one lead worker, Bennie Self, testified that Taylor would "get on him" if he was not doing his job. There is also, however, evidence that Ms. Riddle was told by Mr. Roderick of his "disappointment" in the shipping department's performance.

26

Nathan Fletcher stated that he talked with Ms. Riddle about her problems. Ms. Riddle's testimony revealed that she talked with Gary Taylor about her problems. Taylor testified that he "tried to work things out with Ms. Riddle [but] he never documented anything."

After consideration of the evidence the court finds that the employer's proffered reasons for not promoting Ms. Riddle are (1) objectively reasonably; (2) based on information available to decision-makers including Frank Roderick and Gary Taylor; (3) based upon first hand knowledge of the witnesses to Ms. Riddle's performance; and (4) do not reflect a discriminatory failure to advise Ms. Riddle of her shortcomings.

## C.     Failure to Follow "Procedures"

In her post-trial brief Ms. Riddle has argued that proof that Gary Taylor failed to adhere to company policy is circumstantial evidence of discrimination citing *Carter v. Three Springs Residential Treatment*, 132 F.3d 635 (11th Cir. 1998).[17/] In *Carter* the Eleventh Circuit noted that the defendant had failed to post a job vacancy as policy required and had "bent or broken rules" to give non-minority applicants an edge in the selection process. In reversing the district court's grant of summary judgment the panel observed that this evidence together with other evidence in the case could create a genuine issue of fact. It is significant as a matter of law that the policy which was not followed in *Carter* related directly to the selection process itself. Ms. Riddle contends that Mr. Taylor failed to follow an altogether different policy related to the progressive discipline of employees

---

[17/]     Plaintiff also cites *Gallo v. Prudential Residential Services, Limited Partnership*, 22 F.3d 1219 (2d Cir. 1994), a Rule 56 case, in which a company's apparent failure to fill new positions in the company with employees subject to a reduction in force as required by a Policy Manual could be considered in ruling on summary judgment. There is no factual similarity to the unspecified ""practice" in Ms. Riddle's employment action.

who engaged in misconduct or malfeasance. It is also significant that Ms. Riddle does not contend that the failure to follow the disciplinary policy resulted in improper disciplinary actions against her, rather she alleges it permitted other employees to avoid written reprimands when she deemed such an action to have been warranted.

The cited authority has little bearing on the analysis of the ultimate question of intentional discrimination. The promotion policy as recognized by both parties consisted principally of an expressed intent to promote the most qualified person to a position. (Plaintiff's Exhibit #23).[18] Prior to unionization the company policy did not consider seniority to be a controlling factor although seniority might be a factor when all other criteria were equal. (Court's exhibit #1, Roderick Deposition, p.45-46; Court's exhibit #2, Roderick 1994 Deposition, p.34-36). The promotion process involved Roderick as the plant manager and ultimate decision-maker, Gary Taylor as supervisor of the shipping department as well as Mike Ward, the personnel manager, and the second and third shift supervisors, Mr. Nathan Fletcher and Mr. Bob Eddy. (Court's Exhibit #2, Roderick's 1994 Deposition, pp.15-16).[19] Information concerning the possibility of appointments to the lead

---

[18]    The employee's handbook, p.49.
        **PROMOTIONS**
        Your performance will guide us in considering you for promotion and new assignments.

        The company's objectives are to place the most qualified people in every assignment and to provide advancement for loyal, industrious workers.

[19]    Q:    In addition to Mr. Taylor, were the decisions that were made relating to Exhibit 1 also – was there anyone else who participated in those decisions besides you and Mr. Taylor?
        A:    Yes. Mike Ward, who was the personnel manager at the time, would certainly have been called in, because he was –among other things, he was the record keeper as far as personnel was concerned. The shift supervisors would have been called in– that's Mr. Eddy and Mr. Fletcher–because they contacted people on the back shifts, the lead persons, in the course of an evening's work.
        Q:    Do you remember consulting a Mr. Taylor about whether or not Ms. Riddle would be appropriate for one of these promotions.
        A:    I don't remember specifically.

person position certainly included the views of Mr. Taylor but also included observations from other

managers attending the January 1984 meeting. (Roderick's 1994 deposition at p.33-34). To the

extent that Gary Taylor had input into the selection process, his opinion was weighted more heavily

than the others "because it was his department."[20] (Roderick 1994 deposition, p.16). Although the

lead worker position vacancies were not posted it is obvious that Ms. Riddle had knowledge of the

potential vacancy before it was and actively sought the position. Company practice generally

provided for a posted notice announcing promotions after the fact. A review of the promotion

procedure in place at the time of the selection of James Harvell makes clear that impermissible

deviations addressed in *Carter* did not occur at Cerro Wire.[21]

Ms. Riddle focuses her challenge to the adherence to "policy and procedure" not upon

the selection process itself but, rather, upon Mr. Taylor's failure to implement the company's

progressive disciplinary policy arguing that his conduct was a pretext for discrimination. The Cerro

Wire employee handbook provided that.

> ... Our first concern is that such discipline be administered fairly and for due cause. The following procedure applies to all:
>
>> The employee's first offense will be followed by a verbal warning from his supervisor discussing its nature and extent.
>>
>> In the event of a second offense the employee will receive a written warning. A copy of this

---

[20]     It is not readily apparently that Taylor actually attended the meeting. Roderick testified that he had spoken to Taylor by phone about the appointments.

[21]     Plaintiff has also contended that the promotion process and the criteria upon which promotions were made is evidence of discrimination. That contention is addressed below.

> will be placed in the employee's personnel
> folder.
>
> A further offense can result in discharge and a
> loss of seniority.
>
> The above procedure does not apply to offenses of
> gross misconduct such as intoxication, fighting or
> deliberate safety violations which can result in
> immediate discharge.

(Plaintiff's Exhibit #6).

Ms. Riddle produced evidence concerning the progressive disciplinary process in two forms. First, Ms. Riddle introduced a number of disciplinary "write ups" from supervisors other than Gary Taylor related to employees other than Ms. Riddle as proof of the company policy to record acts of misconduct. Evidence also was introduced indicating that company policy sought to "avoid verbal orders."[22] Ms. Riddle also produced two written disciplinary notices from Gary Taylor directed to employees other than Ms. Riddle. The latter evidence was an August 19, 1980 verbal warning from Gary Taylor to Linda Franks (Plaintiff's Exhibit #11) and Carolyn Smith (Plaintiff's Exhibit # 7) on the same date for the same infraction. (Plaintiff's Exhibit #7). These warnings referred to the improper use of pallets in the shipping department. *Id.*

The evidence preponderates that while Cerro Wire urged its managers to record discipline, many mangers did not and, specifically, that Gary Taylor rarely "wrote up" employees under his supervision. There is no evidence that he ever did so for a first offense.

---

[22] Ms. Riddle consistently referred to various documents as "avoid verbal orders forms." The annotation "avoid verbal orders" appears on any number of documents maintained at Cerro Wire and do not appear to be a discrete "form" but rather the legend appears as an admonition to avoid verbal orders where ever possible. Indeed, that was the testimony of Mr. Roderick when he said "it was our policy. It was a thing that we continually exhorted them to do, but, of course, they were busy on the floor at the time, and some things got by them and didn't get done. It was certainly not fully implemented." (Roderick's 1994 deposition, p.46).

### (1)   Testimony of Gary Taylor

Gary Taylor acknowledged he knew the progressive disciplinary policy (plaintiff's exhibit #6) called for first a verbal warning which was later written up; second, a written warning which would remain in the personnel file; and, third, possible discharge. He stated, however, that he "tried not to write up employees." He said that "I never issued written warnings to employees if I could avoid it." His testimony was that "I don't document or write up employees .... [I] try to work out my problems ... try to be fair ..." Specifically with regard to Elaine Riddle, Mr. Taylor testified that he "tried to work things out with Ms. Riddle ... never documented anything...." He stated that he "would not reprimand [Ms. Riddle] for a lack of self-motivation or the lack of motivation."

### (2)   Testimony of Nathan Fletcher

Fletcher, also a supervisor, stated that "while the policy called for writing people up ... I would talk to people first before I wrote them up...." He stated that it was "the same with Elaine Riddle that [I] would talk first and work together to work out problems...." Fletcher stated that "Elaine would put people she did not like on machines that were harder to operate... [but I] did not write her up for that because ... [I] am not big on writing people up."

### (3)   Testimony of Willie Ray Sharply

Willie Ray Sharply testified that "Gary Taylor was a good manager.... He didn't write people up...."

(4)    Testimony of Bennie Self

Bennie Self testified that "Gary Taylor was ...."  "Gary would talk to you first...  The rule was to write up workers but he would talk to you first."  Self specifically stated that he himself had complained to Taylor concerning a particular employee.  Self stated that he "reported a worker, Space Boy, to Taylor who didn't do anything to him....  He didn't write him up even though he [Space Boy] wouldn't work."  Self recalled being particularly disturbed that Taylor refused or simply failed to write up or discipline the employee known as "Space Boy."  Self was faced with the problem of other employees complaining to him as the lead person about "Space Boy" while he was unable to get Taylor to take disciplinary action.  Self stated that "there were comments from others that 'Space Boy' was dragging around and getting paid like the others but Gary didn't do anything about it."

(5)    Testimony of Paul Ferguson

Ferguson testified that "Gary Taylor was a laid back, easy-going kind of guy ... probably did not put things in writing...."  "Taylor's way of doing things was to talk to the employees."

(6)    Testimony of Frances J. Roderick

Roderick testified that at page 46 of court's exhibit #2:

Q:     Regarding the policy of documentation and "avoid verbal orders" was that policy carried out fully by the supervisor?

A:     Not really.  It was our policy.  It was a thing that we continually exhorted them to do, but, of course, they were busy on the floor at the time and

32

> sometimes things got by them and didn't get done.  It was certainly not fully implemented.

> Q:    How would you characterize Mr. Taylor in terms of documenting and following the AVO policy?

> A:    Now, on that particular policy he probably was as weak or weaker than most. Kind of at the bottom of the pile.  Mr. Taylor lived out of his head.

It is important to recognize that while Gary Taylor violated the company policy concerning progressive discipline and employee "write ups" there is simply no basis for the inference that Taylor's failure to adhere to the disciplinary policy was a mechanism for gender discrimination resulting in the disparate treatment of Ms. Riddle.  Every witness that testified stated that Taylor almost never wrote up anyone for any violation.  This palpable laxity is demonstrated by plaintiff's offer of the only two disciplinary write ups of employees attributed to Taylor which occurred on the same day concerning the same subject four years before the promotion at issue.  The fact that other supervisors may have followed more closely the disciplinary policy does not support the inference that Taylor's failure to do so was the product of a discriminatory animus.

After review of both the promotion's policy and the disciplinary policies as they existed at the time of the promotion the court finds that there is no evidence to suggest that promotional rules or standards were manipulated to produce a biased result nor that Gary Taylor's laxity in documenting disciplinary actions is evidence of the disparate treatment of Elaine Riddle in the selection of Jerry Buck Harvell.

D.    The Bias of Gary Taylor

In her complaint Ms. Riddle argued that her supervisor, Gary Taylor, intentionally discriminated against her because she was a woman when he recommended James Buck Harvell as lead person for the second shift in the shipping department in January of 1984. Ms. Riddle testified at trial that "...[Gary Taylor] was the only one who discriminated against me." Ms. Riddle points to four evidentiary submission in support of her conclusions. They are (1) Taylor's February 1983 speech to the men when Riddle became acting lead; (2) Taylor's 1988 deposition in which he stated that many of the men had girlfriends or were married and he "knew how it was to take orders from a woman;"[23] (3) Taylor's alleged failure to support Riddle in disciplining co-workers; and (4) although not explicitly enumerated, Ms. Riddle would appear to argue that her appointment to "temporary lead person" rather than a "permanent lead person" is evidence of discrimination.

(1)    Meeting With the Men - Deposition Statement

Ms. Riddle testified that in a meeting with the employees of the second shift in the shipping department around February of 1983, Mr. Taylor told Riddle to "stop up her ears...." According to Ms. Riddle, Taylor then told the men that "they might not like taking orders from a woman but that he had placed her there because she could do the job and had been there the longest." Ms. Riddle further testified that Taylor clearly told the men "if she told them to do something it was like it was coming out of his [Taylor's] mouth." Ms. Riddle stated that she found Taylor's prefatory remark to be discriminatory because (1) Taylor would not have told her to "stop up her ears" if he

---

[23]    1988 Deposition of Taylor at p.41. Plaintiffs' counsel asked Mr. Taylor about this statement during his direct testimony.

34

meant nothing by the remark; and (2) Taylor should have used the word "Elaine" rather than the words "she" or "her" or "a woman" when addressing the men concerning her position. In direct examination, Mr. Taylor confirmed that he had made such a statement although the men had never complained to him about taking orders from a woman. Ms. Riddle has likened Taylor's comments to those of the supervisors in *Ross v. Rhodes Furniture, Inc.*, 146 F.3d at 1291.[24/] In *Ross* the Eleventh Circuit concluded that a floor supervisor's statement while pointing to the plaintiff Ross, an African-American, and stating "you see that one over there? I'm going to get rid of him." to a white man evinced racial animus. Another supervisor in *Ross* said "I have never seen as many blacks in this building except in a Tarzan movie." These comments were held to constitute circumstantial evidence of a discriminatory animus. In the present case, in light of the entire record, the remarks of Taylor do not support the inference of gender bias. Mr. Taylor's remarks may be subject to a number of inferences. At least one and in the view of the court the most plausible inference is that Taylor was instructing the men that despite any bias they might entertain, they were to follow the instructions of Elaine Riddle because Ms. Riddle was their supervisor.[25/] In context, Taylor's preamble, however ill-advised it might appear in retrospect, was not an "inappropriate remark" suggesting that women as a class or Elaine Riddle as an individual were incapable of serving as a supervisor or leader. To the contrary, the remark appears to be an exhortation to the workers that they should respond to Ms. Riddle as they respond to Taylor and an admonition that they would be expected to do so.

---

[24/]    It is significant to note that the issue in *Ross v. Rhodes* was the propriety of a district court setting aside a jury verdict returned in favor of the plaintiff on the grounds that the remarks constituted only "isolated general racial remarks" lacking probative force in proving *Ross's* claims.

[25/]    This appears to be consistent with what both Fletcher and Gary Taylor told the workers on the second shift.

In his 1988 deposition, Taylor explained in part his reason for addressing the men in the way he did by saying:

> A:     Like I said, most of the men either had girlfriends or were married and I know how it is to take orders–(to the reporter) excuse me. –from a woman.

(1988 Deposition of Taylor, p.41, as referenced by plaintiff's counsel).

> Q:     Is that a good or bad thing?
>
> A:     It's according to the circumstances.  It was more of a morale booster as I said earlier.  It was not a statement meant to be – put Ms. Riddle down.

(1988 Deposition of Taylor, p.41).

The answer came in response to a question which in fairness must be included.  The question was:

> Q:     At that point, did you consider that it was possible that the men resented taking orders from her?
>
> A:     They had never came to me and complained about it.
>
> Q:     Their morale was just low?

(1988 Deposition of Taylor, p.40).

In recalling the meeting, Marty Rylant clearly remembered Taylor telling the men that Elaine "was in charge and we should do what she said."  In context it would appear that Taylor's recognition of the possibility of hesitancy to follow instructions from Ms. Riddle prompted his prophylactic effort to ensure that the workers were informed of her position.  While in retrospect Mr. Taylor's comments may appear to be evidence of managerial ineptitude, the court does not find that the deposition testimony nor the February 1983 meeting with the men indicates gender bias.[26]

---

[26]     There is contradictory evidence related to a gender bias on the part of the other workers. John Steele testified he thought Ms. Riddle did a good job and that she should have received the promotion.  Marty Rylant, however, testified that he "had the feeling" that Steele resented working for a woman.  No one testified that they resented working for a woman.  Nathan Fletcher testified that it was not possible that the men resented

(2)     Disciplinary "Back Up"

Second, Ms. Riddle contends that Gary Taylor failed to provide her with proper

"backup" in disciplining the employees on second shift. While Ms. Riddle's testimony generally

referred to "problems" with the men, she identified only two specific incidents in which she felt she

was not properly supported. As noted earlier it is undisputed that on one occasion the men on second

shift were playing with plastic material shaped into a ball during work hours. Without a question, Ms.

Riddle properly reported to Gary Taylor that men on the second shift were playing ball and that there

was a safety hazard. According to Ms. Riddle, Mr. Taylor told her that if she saw the men playing

ball she should "get in there with them." She also testified that she heard later from the men that

Taylor had told them that they could play ball on breaks so long as "they didn't get caught." During

his direct testimony Taylor acknowledged that he had himself been disciplined for playing ball during

working hours. John Steele testified that when he worked on day shift with Gary Taylor, Taylor

would throw a football with the men. Mr. Taylor stated at the time of trial that he continued playing

ball during working hours. Ms. Riddle testified that she did not believe the incident was handled

properly by either Nathan Fletcher or Gary Taylor. Ms. Riddle stated that while both Taylor and

Fletcher talked to the men about ball playing, neither of them "wrote them up." The alleged failure

of Taylor to "write up" the second shift workers who played ball is wholly consistent with Taylor's

approach to discipline discussed above. While Taylor's management judgment might be suspect,

there is simply no indicia of gender discrimination in his handling of the incident. Indeed, the events

---

taking orders from a woman. There is no evidence that Taylor approved of gender bias. There is evidence
that he told the men Ms. Riddle was to be obeyed as if the order had "come from [his] mouth." There is no
evidence that Taylor, Fletcher or Roderick condoned or permitted gender biased discrimination.

developed in a predictable manner given Taylor's childlike attitude toward recreational activities during work hours.

The second incident that Ms. Riddle contends demonstrated a lack of management backing occurred when John Steele refused to carry out an order sometime after July of 1983. When Ms. Riddle told Steele to move some material, Steele told her that he "did not have to because [she] wasn't his lead and he wasn't going to move it." Ms. Riddle told Steele that he would move it or "go see Nathan." Mr. Steele then responded if you want to you can "carry me [to Nathan]." During the meeting with Fletcher, Steele acknowledged that he had refused Ms. Riddle's orders. Steele stated that he had refused in part because Gary Taylor told him that Riddle was not "his lead." There is no question that Nathan Fletcher told John Steele that while "[Ms. Riddle] might not be an official lead, Steele was to do what she told him to do." Steele then reported to other workers he had received "a talking to" from Fletcher. Ms. Riddle contends that Fletcher's actions were inappropriate because "a verbal talking to was not sufficient punishment."

The only reference to Gary Taylor in the John Steele incident was the statement by Steele that Taylor had said that Ms. Riddle was not "his lead." Ms. Riddle acknowledges that the incident occurred after July of 1983 when it became known that she was not "an official lead." There is simply no evidence to support that conclusion that Taylor influenced Fletcher's decision to only administer a verbal warning without subsequent write up to Steele. The disciplinary action sought was from Fletcher, not Taylor. If there was a failure to administer proper discipline, the failure rested with Fletcher. Fletcher's handling of the incident with John Steele was consistent with his own record

38

in disciplining workers.[27] During his testimony Mr. Fletcher testified that while insubordination might be a "firing offense" under the policy, he would not necessarily fire an employee for the offense. Fletcher testified that depending on the circumstances he might "send them home and have them come back and talk to the plant manager." Fletcher acknowledged that he vaguely recalled Ms. Riddle bringing John Steele to him for some form of discipline. Like Taylor, Fletcher stated that he always "talk[ed] to people first before I wrote them up.' The John Steele incident provides no support for the conclusion that Gary Taylor harbored a gender animus.

Ms. Riddle was unable to point to a single male employee who received superior "backing" from Gary Taylor. Bennie Self, a temporary and later permanent lead worker, testified concerning his own frustration at Taylor's refusal to discipline a worker known as "Space Boy." Ms. Riddle has suggested the comparison between herself and Self is improper because (1) Self was a "acting lead" when he was hired while Riddle was a long-time employee who was not known as a lead worker until July of 1983; (2) that Self received evaluations from Taylor; and (3) that Self received written warnings of his performance deficiencies and Ms. Riddle did not. The first issue is a distinction without a difference. Ms. Riddle has a statutory right to protection against gender discrimination. She has no statutory right to hold the position of lead person as distinguished from "acting lead person" in the absence of a discriminatory intent. It is not readily apparent from the testimony of Bennie Self whether he was "an acting lead" or a "permanent lead" when he attempted to persuade Taylor to discipline "Space Boy." What is clear is that Taylor's response to Self was virtually identical to that made to Ms. Riddle when she sought discipline of those workers. Self was

---

[27]     Pat Couch, Ms. Riddle's sister and lead worker in the packaging department at the relevant time, testified that Nathan Fletcher always "backed her up with both men and women" on disciplinary matters.

hampered in his ability to satisfy other members in his crew who saw "Space Boy" get away with not performing his work properly. Both Riddle and Self felt that Taylor did not take the action they deemed required by the situation.[28]

      Ms. Riddle's contention that Self was evaluated by Taylor and she was not is simply wrong. To support her claim Ms. Riddle introduced evidence of three performance evaluations: Plaintiff's Exhibits #24, the December 8, 1983 performance evaluation of Elaine Riddle; Plaintiff's Exhibit #26, the undated performance evaluation of Bennie Self; and Plaintiff's Exhibit #27, the December 8, 1983 evaluation of Jerry "Buck" Harvell each of which appeared on the same preprinted form. The evaluation of Self appears to have been reviewed by Mr. Roderick sometime in December 1983. There is no record that performance reviews of any type were made by Taylor of any employee prior to December of 1983. Indeed, Mr. Roderick testified he did not remember all of the forms used in 1983 and 1984. (Court Exhibit #2, p.31, lines 6-21; p.33, lines 3-9). Plaintiff's exhibit #25 dated May 25, 1984 is a more detailed employee review form than those of December 1983. Plaintiff's exhibit #25 is the review of Marty Rylant signed by Gary Taylor. The form has a signature block for the employee although like Exhibits # 24, #26 and #27 it is not signed by Rylant. Plaintiff's Exhibit #25 has a place for written comments by the supervisor. Taylor made no notations. He merely checked boxes on a rating scale  There is no indication that Taylor ever discussed the evaluation with the workers.

      Ms. Riddle also contends that Mr. Self received "written warnings of his performance deficiencies whereas Ms. Riddle did not receive any written notice or warnings of any alleged job

---

[28]     The law appears to be that there is no discrimination when the unwanted result is borne equally by all employees. *Hill v. K-Mart Corp*, 699 F.2d 776, 778 (5th Cir. 1983) (No racial or sexual harassment where manager mistreated all assistant managers with "measured disdain.")

deficiencies." In support of this contention Ms. Riddle introduced plaintiff's exhibit #71, a December 4, 1985 record of a criticism of Bennie Self made almost one year after Harvell's promotion. Plaintiff's exhibit #71, however, is not from Gary Taylor but from Glenn Slovick.[29] Plaintiff's exhibit #72 is a May 21, 1986 notice of deficient performance signed by Sidney Austin, Self's superior at that time. Plaintiff's exhibit #73 is a June 24, 1986 notice of deficient performance also signed by Sidney Austin. It is clear that while Mr. Self may have received a notice of deficient performance on and after December 1985, neither he nor Ms. Riddle received a written notice of deficiencies from Gary Taylor or anyone else in the period 1983-1984. Mr. Self testified that Gary Taylor would occasionally tell him what he was doing wrong in his job. There is no indication, however, when these discussions occurred, whether before or after the January 1984 promotion of Self to lead person. There is simply no evidence that these comments occurred prior to the selection of James Buck Harvell. Taylor stated that Ms. Riddle failed to follow up on assignments or to get in with the men and help them because he believed she felt she "didn't have to." He testified that he talked to Ms. Riddle and "tried to work things out." There is also evidence that Nathan Fletcher did talk with Ms. Riddle concerning some of her job difficulties.[30] Fletcher also stated that the absence of written warnings in the disciplinary context did not mean that there were no problems with Ms. Riddle's performance. Ms. Riddle also confirmed that Mr. Roderick sent Billy Ray Eddy, another manager, to observe the shipping department

---

[29]    Gary Taylor resigned from Cerro Wire in July 1985. (Roderick deposition).

[30]    There is also evidence that Mr. Fletcher talked to others about Riddle. Pat Couch testified that Nathan had spoken to her about spending too much time talking about "personal matters" with Ms. Riddle. This is consistent with complaints that Riddle was away from the shipping department and in the packaging department with her sister.

The evidence is clear that it is only Ms. Riddle's perception that provides a basis for the claim that had she been a man she would have received different backing from management. Of course, "a plaintiff's 'conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination when [an employer] ... has offered evidence of legitimate, non-discriminatory reasons for its actions.'" *Longariello v. School Board of Monroe County, Florida,* 987 F. Supp. 1440 (S. D. Fla. 1997), *citing Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376-77 (11th Cir. 1996). The court finds as a matter of fact that the disciplinary deficiencies of Gary Taylor produced the same frustration for lead persons without regard to gender. The court finds moreover that the specific complaints of Ms. Riddle were addressed, albeit not to her satisfaction, by Taylor and/or Fletcher. The court further finds that Taylor's alleged discriminatory conduct mirrored the conduct of Nathan Fletcher who has not been accused of gender discrimination.

### (3)   Permanent/Lead Worker

Ms. Riddle does not concede that she was appointed a temporary or acting lead worker in January of 1983. Ms. Riddle believed not only that she was a lead worker but also that she was entitled to the per hour pay differential of a lead worker. It is beyond dispute, however, that after July of 1983 Ms. Riddle knew she was not a lead worker but at most a candidate for that position. The factual issue is whether Taylor's alleged promise to make Ms. Riddle a lead person and his subsequent failure to do so is evidence of gender discrimination?[31] At least one second shift employee acknowledged that Ms. Riddle was identified as "acting lead" when he came into the department.[32]

---

[31]   This assumes of course that Taylor made such a commitment which he disputes.

[32]   See the testimony of John Steele – "He [Taylor] told me she was in charge like a temporary lead."

Other workers testified that Ms. Riddle was identified as lead person without designation as "temporary."[33] Still others testified that they were not aware that Ms. Riddle had any lead person responsibility.[34] The record reveals that other workers at Cerro Wire had served as temporary or acting lead workers. Ms. Riddle had been an acting lead in the packaging department prior to her transfer to shipping. Mr. Harvell had been acting lead in shipping in Ms. Riddle's absence in July of 1983. Mr. Self was hired as a temporary lead worker. Whether Mr. Taylor intended to recommend Ms. Riddle for promotion to lead worker is not clear. It does not even appear to be clear to Mr. Taylor. What is clear is that he did not recommend her for promotion and from July of 1983 Ms. Riddle knew that he had not. The Employment Verification Form completed in the Fall of 1983 does not alter this basic fact. Whether the person completing the form, whomever that may have been, thought Ms. Riddle was the permanent lead person in the shipping department or not, Ms. Riddle certainly understood at that time that she was not.[35]

It certainly appears that Taylor's managerial ineptitude coupled with the timing of the union campaign may have given rise to an unfair result. Viewed in the light most favorable to Ms. Riddle, the evidence might support the inference that Taylor fully intended to recommend her promotion to lead worker but dallied until the union campaign activity prevented him from doing so and subsequently concluded that she should not be a lead person. In this light Ms. Riddle may well have been entitled to lead person pay until her "demotion" in January of 1984. Ms. Riddle

---

[33]     See the testimony of Marty Rylant.

[34]     See the testimony of Willodean Mullins.

[35]     The employment verification form does not compel the conclusion that even the person completing it thought Ms. Riddle was a permanent lead. The form merely identifies Ms. Riddle as "lead worker" without regard to the duration of the designation. Ms. Riddle was in fact a lead person at that time albeit temporarily so.

43

understood herself to have been "demoted" in January of 1984 according to her testimony. Had Taylor recommended Ms. Riddle for lead person in January of 1983 she would have been paid more money. He did not and she was not. This certainly appears unfair. "Nevertheless, an individual employee may be given a 'raw deal' in a personnel action in the absence of any discrimination forbidden by law. ... Fair minded people who do learn of it naturally yearn to correct it. Given power to do so, one might correct the injustice even though the exercise of power exceeds authority." *Roberts v. Gadsden Memorial Hospital*, 835 F.2d 793, 801 (11th Cir. 1988) (Judge Hill concurring). "Federal courts must correct injustices resulting from violations of federal law. The temptation to decide, in other cases, who is 'right' ... should be resisted. ... even where the employee who is unfairly treated is a member of a protected group." *Id.* There is simply no evidence that Taylor's failure to submit the necessary "paperwork" if indeed he had undertaken such an obligation was an act of discrimination.

After consideration of all the evidence the court finds that Ms. Riddle has failed to establish that Gary Taylor possessed a gender-based discriminatory animus which resulted in his intentional failure to support her in her position as temporary lead person.

E.      Infection of the Selection Process

While the court cannot find that Ms. Riddle has demonstrated that Mr. Taylor possessed the requisite discriminatory intent, the facts surrounding the particular promotion at issue reveal that Taylor's participation in the selection process did not produce a discriminatory result.[36]

---

[36]      This finding is distinct from suggesting that defendant has an obligation to prove that it would have reached the same employment decision without regard to the unlawful consideration of an impermissible factor. Here the court merely finds that even if it is assumed that Taylor possessed some gender bias, the information

As a threshold matter it is not altogether clear that Gary Taylor was even present at the meeting which resulted in the promotion of James "Buck" Harvell.[37]  Mr. Roderick testified that he had attempted to speak with Taylor concerning the upcoming promotions because Taylor was soon to enter the hospital.  Mr. Roderick's testimony does not compel the conclusion that Taylor actually attended the meeting.[38] Each person who attended the meeting which resulted in the promotion of Jerry "Buck" Harvell testified that they did not recommend Nora Elaine Riddle for promotion.

### (1)    Testimony of Nathan Fletcher

Nathan Fletcher confirmed that in his deposition he was "pretty sure" he told Roderick to promote Harvell.  He recalled telling both Roderick and Gary Taylor about Riddle's performance

---

provided by Taylor concerning Ms. Riddle's performance, which may have affected Roderick's decision, was substantially the same as that provided by other managers as well.

[37]    From Roderick's deposition (Court Exhibit 1, pp.17-18):

Q:    Well, I'm not trying to put words in your mouth, but as I understand it, you said something about Taylor having been sick for a period of time and having been in the hospital; is that correct, during this period?
A:    Certainly, I think he was in the hospital when this notice came out.
Q:    Did you confer with him about any of the –
A:    Yes.
Q:    – promotions during the time that he was in the hospital?
A:    Yes.  I recall talking with him while he was in the hospital.
Q:    What happened when you talked to him while he was in the hospital?
A:    Well, I can only remember two occasions really, and I don't remember them too well.  But on one occasion I talked with him, and he was in considerable pain and couldn't talk with me too long, it was very distressing for him.  And I also talked with him, I know that I talked with him before that document went out, let's say, to make sure that he was in accord with it.

[38]    Plaintiff has suggested that Taylor's December 8, 1983 evaluation of Ms. Riddle should not be considered by the court in assessing the employer's reasons for failing to promote Ms. Riddle.  Plaintiff argues first that Mr. Roderick did not testify that he had ever seen the evaluations.  Plaintiff also intimates that the document may have been prepared after the selection.  While the court finds no evidence of the later, it is assumed that Roderick did not see the written evaluations of Riddle or Harvell.  That is consistent with his testimony (Court Exhibit 1, p.32):

Q:    Prior to making promotion decisions, was it customary to look at evaluations of people?
A:    There are other people who might have looked at it instead of me.  I mean, Mike Ward, Gary Taylor, so I don't know.  I wouldn't necessarily have looked at the documents.

as a lead person. He stated that he "told them I wouldn't recommend her because she could do the job but she could not get along with people and get them to do what needed to be done." She "could not communicate and get them to do what was asked." She failed to communicate and get them to do what is asked rather than threaten them with "I'll carry you to the office."[39]

### (2)   Testimony of Billy Ray Eddy

Billy Ray Eddy testified that while he did not make a recommendation as between Harvell and Riddle, he "didn't think [Riddle] was lead person material." He "didn't think she could handle people."[40]

### (3)   Testimony of Mr. Roderick

Concerning the input of Eddy, Mr. Roderick testified that:

A:   Mr. Eddy was not happy with Ms. Riddle's performance. And that is all I have to say.

. . . .

Q:   With respect to your impression as to what Mr. Eddy said concerning Ms. Riddle, that's only an impression; you don't have a clear recollection of those events, do you?

A:   I don't remember any words, per se.

Roderick's testimony is consistent with Eddy's recollection.[41]

---

[39]   While Fletcher is not accused of gender discrimination it is also true that he had recommended other women for lead person positions including Patricia Couch, Carolyn Walker and Shirley Griffin.

[40]   Eddy would not recommend Harvell either.

[41]   Plaintiff objected to consideration of Roderick's testimony concerning Eddy's input because it called for speculation citing *Walker v. Mortham*, 158 F.3d 117 (11th Cir. 1998). *Walker* and the cited footnote are not

### (4)    Testimony of Mike Ward

Mike Ward told the participants of the meeting of problems between Riddle and other lead workers and employees as more fully discussed above.[42] Ward testified that both Riddle and Harvell were discussed and that he recommended Harvell. In short, the evidence preponderates that the reasons Mr. Roderick gave to Ms. Riddle for not promoting her were derived not only from Gary Taylor but from Mike Ward, Nathan Fletcher and, to a large degree, were corroborated by information received from Billy Ray Eddy.

In support of her claim that Taylor's presence in the decision making process tainted the selection of Harvell, Ms. Riddle cites four cases from other circuits. In *Simpson v. Diversitech General, Inc.*, 945 F.2d 156 (6th Cir. 1991) an African-American worker was terminated after a violation of a "last chance agreement." The "last chance agreement" was based on an earlier incident of alleged misconduct. The district court found direct evidence that the handling of the earlier incident had clearly been racially biased. The fact that the supervisor who had discriminated against the plaintiff in the earlier incident did not make the challenged termination decision, did not insulate

_____

relevant to the evidentiary question. Roderick did not speculate about anything. He said that while he could not recall the words he understood Eddy was not happy with Riddle's performance. The authority cited in footnote 8 and reiterated by Ms. Riddle did not consider the admissibility of testimony but, rather, noted that a district court may not "assign" its own reasons for a job action, which is not the case here. *Walker* also noted that a district court may not make a comparison of qualifications where there is no evidence that the decision-maker had the information upon which to make such a comparison which is also not the case here.

[42]    Ward also recalled an incident which occurred in 1981 involving James Mohammed and Elaine Riddle. Ms. Riddle, who also testified concerning this event, said that Mohammed had been harassing her by throwing pellets at her while she was attempting to unload a truck. Later, Mohammed jumped on her forklift interfering with her work. She confronted Mohammed in the break room and after an argument she told Mohammed "most black people I consider black and you at this moment I consider you a nigger." Later in the evening Mohammed struck Ms. Riddle. Mohammed was fired. Mike Ward testified that he believed that incident with Mohammed was sufficient to demonstrate that Ms. Riddle should not be promoted. The Mohammed incident is relevant only to the extent that Ward recounted it when he "made his input in the meeting."

47

the earlier discriminatory act. In *Simpson* the plaintiff was fired because he violated a "last chance agreement" which was itself the product of racism. Without the racist act there would have been no termination. In Ms. Riddle's case, if Mr. Taylor had a discriminatory motive, which the court finds he did not, the information provided to Roderick was essentially the same as that provided by Eddy, Fletcher, and Ward, which in turn confirmed information already possessed by Roderick himself. *Simpson*, a mixed motive case, is not applicable but if it were, Ms. Riddle would not prevail.

In *Dey v. Colt Construction and Development Company*, 28 F.3d 1446 (7th Cir. 1994) the Seventh Circuit reversed a district court's grant of summary judgment observing that plaintiff was "subject[ed] ... to almost daily comments, gestures and innuendo that she considered sexually suggestive and harassing" by the general counsel of Colt Construction. *Dey*, 28 F.3d at 1449. Later, plaintiff complained to her supervisor about the harassment. After a closed door meeting between the general counsel and the president of the company, plaintiff was fired. While the company president testified that he made the decision independently, the Seventh Circuit concluded that there was a reasonable inference to be drawn that the harasser had urged the termination of the plaintiff. This was particularly true in the light of the fact that the plaintiff's immediate supervisor testified in affidavit that he had never complained to the president about plaintiff's work performance and that she was adequately performing her duties at the time of the discharge. In contrast to Ms. Riddle, *Dey* was required to meet only the evidentiary standard of Rule 56. Factually Ms. Riddle's case is distinct from *Dey* in that there is a record of the information concerning Ms. Riddle's shortcomings upon which Roderick made his decision to promote Harvell over Riddle which included input from workers, immediate supervisors, and the personnel director.

48

Ms. Riddle directs the court's attention to *Wells v. New Cherokee Corporation*, 58 F.3d 233 (6th Cir. 1995) a case decided under the Age Discrimination in Employment Act. In *Wells* a jury had concluded that Wells had been discriminated against by the defendant. Shortly before she was fired, plaintiff was told by her supervisor that she was "too old to do the job" and that a "younger person could do more" than she could do. The Sixth Circuit found, as did the jury, that plaintiff's supervisor, Sharp, had exhibited age based prejudice and provided circumstantial evidence that plaintiff was fired because of her age. On appeal New Cherokee argued that the plant controller, not Sharp, the plaintiff's immediate supervisor, made the decision to terminate her. The Sixth Circuit noted that the testimony was convincing that the supervisor and controller worked closely with each other and consulted with each other on personnel decisions. Indeed, supervisor and the controller testified that they acted jointly. In Ms. Riddle's case, of course, there is no direct evidence of gender bias on the part of Gary Taylor. Moreover, while Gary Taylor's opinion would have been weighted more heavily than the other participants in the decision, there is no question that what was relayed by Taylor was identical to the information possessed by all of those involved in the decision making process. There is no direct evidence of discrimination nor is there evidence that Taylor could have compelled the outcome.

In *Josey v. John R. Hollingsworth Corporation*, 996 F.2d 632 (3d Cir. 1993), a Rule 56 case, the Third Circuit found that when Josey, an African-American, was proposed to fill a pending position there was resentment among the companies' managers and employees. The department head who had planned to retire was particularly displeased and chose to remain on the job. The supervisor told other employees that his job could not be "significant if it could be filled by a black person." Josey received anonymous notes with racial threats and epithets. When a business

49

down turn occurred after Josey's supervisor had continued on in his position, the supervisor stayed on and Josey was dismissed. Josey also produced evidence that after his dismissal the company planned to replace him assistant manager with a white person at a higher salary. The Circuit Court concluded that the plaintiff had produced some evidence that the vice-president who actually terminated him did not have full control over employment decisions. The Circuit Court also found that the clearly biased manager was a shareholder in the company as was the white man selected to replace Josey. In reversing the grant of summary judgment the Third Circuit noted that the manager had made derrogatory remarks about being replaced by a black person, the manager had refused to train Josey and the vice-president who terminated Josey had acknowledged that the overtly biased manager would be a problem for Josey. The court also found that the biased manager had flaunted his refusal to train Josey in front of other employees.

In the present case there is no suggestion of a manager/shareholder relationship between the participants in the decision to promote Buck Harvell. There is simply no evidence of gender bias as there was evidence of racial bias in *Josey*.

Cerro Wire notes that three of the five workers promoted in January of 1984 were women. (Defendant's Exhibit #2). Moreover, Mr. Roderick testified that Cerro Wire had often promoted women to lead worker and had no problem in finding qualified women to serve in those positions. (Court's Exhibit #2, pp. 12-14). There is also evidence in the record that Gary Taylor recommended the promotion of women to serve as lead workers. (Defendant's Exhibit #2; Testimony of Willodean Mullins; Testimony of Elaine Riddle; Testimony of Nathan Fletcher; and Testimony of Gary Taylor). Ms. Riddle contends that such evidence is not probative because statistics "without analytical foundation are virtually meaningless" in a disparate treatment case and

50

the fact that "there were female leads in other departments is not probative for the reason that there

was no showing of a comparable departments which were predominately male as well as the lack of

evidence as to who was considered." (Ms. Riddle's May 14, 1999 submission, p.2). Certainly the

court may consider certain statistical ratios in determining a disparate treatment case. *See*

*International Bhd. of Teamsters v. United States*, 431 U.S. 324, 339-41, 97 S.Ct. 1843, 1856-58,

52 L.Ed.2d 399 (1977). As an evidentiary matter, a finder of fact could certainly may consider that

a defendant promoted a number of minority employees to positions which a plaintiff of the same

minority sought and properly conclude that it "[need not] accept discrimination as a plausible

explanation for [defendant's] decision." *Williams v. Mead Coated Board, Inc.*, 846 F. Supp. 1552,

1570 (M.D. Ala. 1993), *quoting Adams v. Reed*, 567 F.2d 1283, 1287 (5th Cir. 1978); citing

*Crawford v. United States Steel Corporation*, 660 F.2d 663, 667 (5th Cir. Nov. 1981). In the present

case the court finds that the fact that Gary Taylor recommended other females for positions as lead

workers to be relevant. Ms. Riddle contends that the evidence is without probative value because

the defendant was unable to demonstrate the makeup of the workforce of the particular department

for which a woman was selected as lead. It would appear, for example, that during the relevant time

period the packing department, second shift, under the direction of Pat Couch was all female. (See

the testimony of Pat Couch). John Steele testified that he knew that during the relevant time period

there were a number of female leads including Mary Pevahouse in mixing and Eunice "Dot" Orr,

Shirley Griffin, Pat Couch, Maddie Bennett, and Betty Stover in casting. Mr. Steele remembered that

Betty Stover was the lead in what was "pretty close to all male department." Mike Ward stated  that

casting had several male employees. Ms. Riddle correctly notes that proof that other members of the

protected minority were in positions of the type sought by Ms. Riddle does not in and of itself

overcome the plaintiff's *prima facie* case. However, in considering all of the circumstances surrounding the appointment of James Harvell and the employment practices in place at the time, the court finds there is some significance to the fact that Cerro Wire employed other female leads and that Gary Taylor had recommended other females for the position of lead worker.[43/]

After consideration of the record and the cited authorities, the court concludes that the decision to promote James Buck Harvell was made by Francis J. Roderick based upon information received from Gary Taylor, Mike Ward and Nathan Fletcher. Moreover, Mr. Roderick's decision also was predicated upon Mr. Eddy's conclusion that Ms. Riddle was not lead person material. Although Eddy did not recommend Harvell, he clearly did not recommend Ms. Riddle either. Unlike the authorities cited by Ms. Riddle there is no direct evidence of gender discrimination and there is substantial evidence that the information supplied by Taylor was corroborated by, if not identical to, the information supplied by all other participants.

F.     Subjective Evaluation Criteria

Ms. Riddle has somewhat obliquely suggested that Cerro Wire's promotion and evaluation criteria produced a discriminatory result in the promotion of Buck Harvell. Ms. Riddle notes that subjective evaluations should be carefully examined when the decision-makers are not themselves members of the protected minority. For this proposition Ms. Riddle cites *Howard v. BP Oil Company, Inc.*, 32 F.3d 520 (11th Cir. 1994); *Miles v. MNC Corporation*, 750 F.2d 867 (11th Cir.

---

[43/]     Over the defendant's objection the court admitted the EEOC determination. The court recognizes of course that the determination is "highly probative of the ultimate issue." *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1554 (11th Cir. 1983), *quoting Smith v. Universal Services, Inc.*, 454 F.2d 154, 157 (5th Cir. 1972). In the present case, however, for the reasons more fully set out in this opinion the court is not persuaded that Ms. Riddle has met her burden of proof.

1985); and the Sixth Circuit case of *Grano v. Department of Development of City of Columbus*, 699 F.2d 836 (6th Cir.1983). In *Howard*, BP Oil Company awarded service station locations to three white applicants while plaintiff's application was pending. Howard, an African-American, apparently satisfied the general criteria for a distributorship. In reversing the district court's grant of summary judgment for the defendant the Eleventh Circuit noted that Howard had offered proof that BP Oil Company lacked written criteria for awarding stations which would permit individualized *post hoc* "explanations" for its decisions and that BP had departed from even those generalized criteria in awarding the three stations to the white applicants. Howard also contended that the recipients of the stations were less qualified than he or completely unqualified. *Howard* teaches that when standards are determined retrospectively in light of a facially discriminatory result, caution should be exercised to ensure a fact finder receives evidence of intent in order to draw appropriate inferences. In Ms. Riddle's case those involved in the decision to promote Harvell had all received information related to Ms. Riddle's performance in the position she sought. To varying degrees, each was aware that she had problems with other leads and that the performance of the shipping department was less than required. There is no evidence that standards were interpreted differently for Ms. Riddle than other workers promoted to lead person.

In *Miles* the Eleventh Circuit observed that when all worker evaluations at the company were performed by a single individual without guidelines for assessing performance or regular checks on employees' work habits, the ultimate decision-maker was required to rely on the opinion of that single evaluator. The Circuit Court noted that the problem associated with this type of worker assessment was that subjective evaluations involving white supervisors provide a ready mechanism for racial discrimination. *Citing Parson v. Kizer Aluminum & Chemical Corporation*, 575

53

F.2d 1374, 1385 (5th Cir. 1978); *Rowe v. General Motors Corporation*, 457 F.2d 348, 359 (5th Cir. 1972); *Robbins v. White-Wilson Medical Clinic*, 660 F.2d 1064, 1067 (5th Cir. Unit B 1981), *vacated on other grounds*, 456 U.S. 969, 102 S.Ct. 2229, 72 L.Ed.2d 842 (1982); *Harris v. Birmingham Bd. of Educ.*, 712 F.2d 1377 (11th Cir. 1983). The appellate court recognized that an individual supervisor is then left free to indulge a preference, if he has one, for the race of one worker over another. There is no evidence that Taylor indulged a gender preference, however, *Miles* is readily distinguishable as the decision to promote Harvell was not based upon the evaluation of a single individual. As set out above, all participants in the promotion decision had received similar information about Ms. Riddle.

In *Grano* the Sixth Circuit noted that while the subjective nature of an employment decision made by a single person was "troubling" the district court's analysis of the ultimate decision was correct. Significantly, the *Grano* court noted that "subjective employment evaluations .. are not illegal per se. The ultimate issue in each case is whether the subjective criteria was used to disguise discriminatory action." *Grano*, 699 F.2d at 837. In the present case, Ms. Riddle was not selected to be lead person because she had problems getting along–the work in the shipping department was not up to the needs of Cerro Wire and it was believed by Roderick and others that Harvell could do a better job. While these are not "checklist" standards, neither are they vacuous.

When hiring or other employment decisions are made without regard to qualifications or in the absence of "reasonably objective standards" a discriminatory practice may be found. *Watson v. National Linen Service*, 686 F.2d 887, 881 (11th Cir. 1982). In Ms. Riddle's case the decision to promote Harvell was based upon consideration of Ms. Riddle's actual performance and the

knowledge the decision-makers had concerning Harvell.  The plaintiff has failed to demonstrate that the criteria utilized by the decision-makers resulted in gender discrimination.

G.     Believability of the Articulated Reasons for the Promotion of James Buck Harvell

The ultimate factual issue is whether Cerro Wire's decision-makers actually believed that James Buck Harvell could do a better job than Elaine Riddle as the lead person on second-shift in the shipping department and reached that conclusion without considering her sex as a negative factor.  The Eleventh Circuit has held that it is the perception of the decision-maker which is relevant to the inquiry.  Title VII does not require an employer "... to promote the most qualified applicant; it only requires that the employer makes such decisions without regard to race, sex, religion, color or national origin." *McCarthney v. Griffin-Spalding County Bd. of Educ.*, 791 F.2d 1449, 1552 (11th Cir. 1986); *see also Smith v. Horner*, 839 F.2d 1530, 1538 (11th Cir. 1988) *quoting Clark v. Huntsville City Board of Education*, 717 F.2d 525, 527 (11th Cir. 1983) holding that "... 'an employer selects the person it believes is best qualified, an argument of pretext will ordinarily fail.'"

Aside from the allegations of gender bias made against Gary Taylor outlined above Ms. Riddle also makes additional arguments in support of her claim of pretext.  Ms. Riddle has offered proof that some workers at Cerro Wire believe that she was performing her job well. (Plaintiff's Exhibit #5 is a handwritten document apparently submitted to the EEOC signed by thirteen employees of Cerro Wire.  The document states:

> I have had the knowledge for a long time that Elaine
> was a lead person, has been performing the job and did
> a good job, the supervisor know that she [sic] that she

55

was a lead person, he told me many times that she
was a lead person.

(Plaintiff's Exhibit #5).

The document is signed by Patricia Couch, Carolyn Smith, Marty Rylant, Bennie Self, Paul Ferguson and others. In addition, Marty Rylant testified that Ms. Riddle "had a pretty good attitude" and "tried to get the job done." He also testified, however, to knowledge of complaints about Ms. Riddle and the performance of the shipping department. John Steele testified that Ms. Riddle "done a good job" and clearly "answered questions." Steele too, however, said that Ms. Riddle often "rubbed people the wrong way." Willie Ray Sharply testified Ms. Riddle "gave him his orders and if he had questions she was there and gave me what I needed to know." Mr. Sharply testified that Ms. Riddle was fair and a good lead person. Sharply said he never saw Ms. Riddle refuse to work with the crew or "lord it over the crew that she was boss." Mr. Sharply also never saw anyone refuse to follow Ms. Riddle's instructions. Paul Ferguson testified that he never saw Ms. Riddle be mean to anyone. Ferguson also testified that he believed the work was being done, but because Cerro Wire was his first employer he "would not have known that it was bad because [he] didn't know anything [about work]." Ferguson acknowledged that he had heard of other complaints about Ms. Riddle. There is a distinction that must be drawn between the anecdotal reports of workers on the second shift and the fact that the shipping department was not performing to required standards. Gary Taylor recognized Ms. Riddle was a good worker prior to her appointment as lead person. Ms. Riddle's supervisors after her tenure as lead worker also believed that she was a good worker. These facts are not inconsistent with the apparent failure of Ms. Riddle to perform adequately as a temporary lead worker in 1983. The

56

testimony of the crew members does not obviate the fact that other leads and other workers complained about the performance of the shipping department and Ms. Riddle.

Ms. Riddle has acknowledged that the bulk of the disciplinary problems that she had came after July of 1983. Ms. Riddle suggested during the course of trial that Cerro Wire should have more completely investigated the complaints from other leads in order "to be fair." She suggested for example that Willie Ray Sharply should have been interviewed about the complaints. The employment discrimination statutes do not impose an independent obligation to investigate matters such as Ms. Riddle's disciplinary relationships with other lead workers, but in any case the evidence is clear that Mr. Sharply who was employed at Cerro Wire for only three months was gone in July of 1983. Mr. Sharply simply could not have been interviewed concerning the information received by the decision-makers. There is substantial evidence that the complaints about Ms. Riddle came from many sources within Cerro Wire including members of Ms. Riddle's crew, other leads and women on other shifts and concerned both performance and Ms. Riddle's attitude. There is nothing unreasonable or unfair about accepting such information upon which to make an employment decision without conducting an investigation particularly when the sources appear so diverse.

Ms. Riddle also argues that pretext is found in the fact that she was the senior person in the shipping department and more experienced than Mr. Harvell. The evidence establishes that seniority was not a controlling factor in promotion decisions.[44] Ms. Riddle acknowledged that Mr. Harvell was a "good worker." She also acknowledged that Harvell had been chosen to act as lead person when she was on vacation. There was a reasonable basis for concluding that Harvell could

---

[44]     For example, when Willodean Mullins was promoted to lead person in 1984 while Linda Franks was the more senior candidate. (Testimony of Mike Ward).

perform the job better than Ms. Riddle because he knew the work, had acted as a lead person and did not appear to have the personal conflicts with other workers that Ms. Riddle was reported to have.

There is also some evidence that even Ms. Riddle did not believe that gender discrimination was the cause of her problems with the second shift crew. Ms. Riddle told Taylor sometime after July of 1983 that the men were not working because they felt they were entitled to raises. Taylor responded by calling the men together with Ms. Riddle into his office where he told them he would try to get more money. Ms. Riddle stated that things were better for a while but that the men would later ignore instructions Taylor left for them saying "to Hell with Gary Taylor. Let him get out here and do it hisself." (Defendant's Exhibit #1, pp.10-11). At least a part of the performance problem was not related to Ms. Riddle's position as acting lead but to entirely separate issues. Again, Taylor attempted to intervene with minimal success.

A review of all evidence related to the promotion of Harvell and Ms. Riddle reveals that Cerro Wire through its managers had a good faith basis for deciding to promote James Harvell over Ms. Riddle. The court further finds that the employer in fact believed Harvell to be better able to perform the function than Ms. Riddle at the time the decision was made. Whether the decision was fair in a broad sense is not issue. The question is whether Ms. Riddle has sustained her burden of proving that the decision was unfair because her sex was considered as a negative factor in the promotion of Harvell. The court finds that she has not.

58

II.    Retaliation Claim

Title VII insulates an employee engaging in statutorily protected activities, such as filing a charge with the EEOC, against retaliation by an employer.  42 U.S.C. § 2000e-3(a).  Proof of retaliation is controlled by the framework set forth in *McDonnell Douglas* and *Burdine*. *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).  Ms. Riddle must meet her initial burden of establishing a *prima facie* case of retaliation.  In order to meet this burden she must demonstrate that "(1) she has engaged in a statutorily protected activity; (2) the employer has taken an adverse employment action; and (3) a causal connection exists between the two."  *Meeks v. Computer Associates Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600-601 (11th Cir. 1986), *citing Canino v. United States Equal Employment Opportunity Commission*, 707 F.2d 468, 471 (11th Cir. 1983).  To recover on a claim of retaliation, Ms. Riddle need not prove the underlying claim of discrimination which lead to her complaint, but she must have had a reasonable belief that discrimination existed.  *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989).[45]

There is little question that in March of 1984 Ms. Riddle engaged in a statutorily protected expression with the presentation of her gender discrimination complaint to the EEOC. While the specific allegations of retaliation are not, by definition, "ultimate employment decision" such as termination or demotion, the Eleventh Circuit has expressly held that Title VII's protection against retaliatory action extends to adverse actions which fall short of such ultimate employment

---

[45]    Ms. Riddle's underlying complaint clearly satisfies the threshold requirement of a "reasonable believe ... [of] discrimination...."

decisions.  *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir. 1998).  The "plain

language of 42 U.S.C. § 2000e-3(a), makes it 'unlawful to discriminate against any of his employees

... because he has made a charge ....'"  *Id.*  To establish the causal relation element of a *prima facie*

case of retaliation, Ms. Riddle must demonstrate that the protected activity and the adverse action

are not completely unrelated.  *Meeks v. Computer Associates International,* 15 F.3d 1013, 1021 (11th

Cir. 1994) (*quoting EEOC v. Reichhold Chem., Inc.,* 998 F.2d at 1571-72 (11th Cir. 1993)).  As in

all contested Title VII issues the burden of proof rests with Ms. Riddle to prove that intentional

discrimination in the form of retaliation motivated the alleged adverse employment action.  It is clear

that not all hostile acts presented for review under the rubric of "retaliation" are wrongful.  *See Wu*

*v. Thomas,* 996 F.2d 271, 274 (11th Cir. 1993).


The Evaluations of 1991, 1992 1993

                    In order to put Ms. Riddle's claim of retaliation in perspective it is important to note

that she first filed her complaint with the Equal Employment Opportunity Commission in March of

1984.  At that time, Ms. Riddle was an employee of Cerro Wire in the shipping department.  On July

30, 1984 Joe Tucker, Ms. Riddle's supervisor, completed an employee review.  (Plaintiff's Exhibit

#50).  On a twelve item performance rating scale, Mr. Tucker found Ms. Riddle's performance to rate

a three on a five point scale in nine of the twelve categories and a rating of four in the remaining three

categories.  Mr Tucker wrote

> Elaine is a hard working individual who generally
> displays a self-starting attitude towards [sic] her work
> in helping her fellow employees.  Most of the time she

60

> requires very little supervision in the performance of
> her assigned duties.

(Plaintiff's Exhibit #50).

On December 12, 1984, nine months after her EEOC complaint, Ms. Riddle was reviewed by Patsy

Smith and James Harvell.  (Plaintiff's Exhibit #51).  Ms. Riddle was rated a three of five in seven

categories and a four for five in five categories.  The evaluation was endorsed by Mike Ward as

personnel manager and Mr. Roderick.  The performance review stated

> Elaine is good worker, she [is] conscientious in
> performing her tasks. She is an assert to the company
> with regarding [sic] to the internal working of the
> shipping department.

In November of 1988 after the conclusion of the EEOC litigation Ms. Riddle instituted this

independent civil action.  Ms. Riddle continued to work on the manufacturing floor of the company

until August 27, 1990 when Ms. Riddle was "promoted" to the position of data entry clerk.  In her

testimony Ms. Riddle suggested that the data entry clerk position was not, in her view, a

"promotion."  Ms. Riddle did, however, concede that she thought that the data entry position was

a "better job" because she had been placed on salary, received better life insurance and pension

benefits.  Approximately one year after Ms. Riddle became a data entry clerk she received a

performance evaluation from her supervisor Pat Lott on July 12, 1991.  Ms. Lott noted that

> Elaine is always willing to help on other jobs in the
> office when her help is needed.  It is important to her
> that her job is done accurate [sic] and completed each
> day even if overtime might sometime be required.

Ms. Lott ranked Ms. Riddle's performance as good in twelve categories and average in ten categories

of the form.  (Defendant's Exhibit #6).  Effective August 27, 1991 Ms. Riddle received a 4.9% pay

increase in her position as date entry clerk. Ms. Riddle testified that she had no disagreements with

the evaluation of Ms. Lott in 1991.   On July 24, 1992 Ms. Riddle received another employee

evaluation by Pat Lott.  Lott noted *inter alia*

> Elaine needs to make better use of her time by
> spending less time talking.

(Defendant's Exhibit #8).

Ms. Lott rated Ms. Riddle's performance as good in fifteen categories and average in seven.  Ms.

Riddle commented on the July 24, 1992 evaluation saying

> I disagree with the talking.  I feel if this was a problem
> this should have been discuss [sic] prior to my review.

Ms. Riddle then attached a statement dated September 15, 1992 in which she stated

> On my review 9-14 under ways of improvement I feel
> this was not justified [sic] I feel in other words I was
> being called a fool.  When looking up the word fool I
> find it means to spend time idly or aimlessly to meddle
> or tamper thoughtlessly or ignorantly or fritter away
> his time.  This is the way I feel my review read.  I feel
> under the circumstances I feel that everyone in the
> office talks in order for me to talk there has [sic] got
> to be someone to talk too [sic].  Has anyone else got
> this on there [sic] review? ..."

(Defendant's Exhibit 8).

She also stated that

> * * * *
> It is a proven fact that I do not let talking keep me
> from doing my job and also helping my fellow
> employees in the office.

Also attached to defendant's Exhibit #8 was a September 15, 1992 letter from Nora Riddle addressed

"To Whomever It Might Concern."  Ms. Riddle stated in the letter that

> The review I got on 9-14-92 I feel is totally unfair, I
> understand that the company is cutting back.  But
> what I don't understand is why some people in the
> same department getting the same type of review are
> getting different pay increases; I feel that it should be
> the same.  I feel I should not be single [sic] out just
> because my review comes in August instead of July or
> June and if this is the case that the company don't
> have the money at this time I feel I should be reviewed
> again in six months when the company is doing better
> to get the pay difference.  I would like to know why I
> started out with 4.8 and then it was marked out to 4.0.
> After my second year in the office with more
> knowledge and job tasks and with a better review than
> the year before why would I drop from 4.9 to a 4.0?

(Attachment 2 to defendant's Exhibit 8).

Defendant's Exhibit 9 is a personnel action request indicating a pay increase of 4 % effective August

27, 1992.  The increase is endorsed by a number of Cerro Wire managers including Pat Lott.

Plaintiff's Exhibit #64 is a similar personnel action request for Mary Pevahouse.  The personnel action

request identifies Ms. Pevahouse as an "inventory control clerk."  The proposed pay increase on July

1, 1992 for Mary Pevahouse is 4.8%.  The personnel action request is endorsed by Cerro managers,

including Pat Lott and personnel director J. Whittington.  In her direct testimony Ms. Riddle testified

that Pat Lott had told her that Ron Welch, Ms. Riddle's supervisor, wanted Lott to "change some

stuff.  He wanted a lower rating than what she [Lott] did."  Ms. Riddle stated that she wrote the

comments regarding her talking during work hours because she disagreed as "we all talk.  We got the

work done."  Ms. Riddle testified that she believed Mary Pevahouse had received a larger pay

increase.  Ms. Riddle stated that while the 1992 evaluation was overall very good, she attributed the

comments concerning her talking to Pat Lott's supervisor, Ron Welch.  Ms. Riddle conceded,

however, that if Mary Pevahouse had received a better review, Ms. Pevahouse would have been

63

entitled to more money. Ms. Riddle also indicated that she compared herself only to Mary Pevahouse

for the purposes of her retaliation claim. She stated that she had "not been told that [Pevahouse] had

a better review." Defendant's Exhibit #10 was 1993 review of Ms. Riddle which observed that Ms.

Riddle needed to improve in the area of attendance. Her ratings as good dropped from 12 to 9 in

1992. Her ratings as average changed from 7 to 12. The performance review was prepared by her

supervisor Ronald Welch. On August 30, 1993 Ms. Riddle wrote to her supervisors stating

> I disagree totally with my review. I feel Ron is not
> capable of giving a fair review after making the remark
> that he was a male chauvinism [sic]. I feel he treats
> women so much different than men. According to my
> review I have dropped in six areas. What this
> supervisor don't like about me is that when I see him
> treating men different from women I speak up. When
> I see I am singled out I tell him how I feel. On my
> review "cooperation willingness to work with
> supervisors" I was given an average. Is this because
> this supervisor don't ever take up time with none of us
> in the office and when we do go to him we feel that it
> is a burden to him and he don't keep a [sic] open mind
> and listen to what we have to see. If he takes the time
> to listen he always makes remarks that make us feel as
> if we are nobody. How can you work with a
> supervisor that has never got time for his employees.
> I dropped in added assignment. Well let me say my
> job as [sic] been cut by three hours a day. I let my
> work go undone sometimes in order to do
> confirmation orders.

. . .

> On another part I dropped in "is inquisitive wants to
> learn new things." How can I learn new things when
> Ron don't even take time to say good morning half of
> the time much less show me new things.

. . .

64

My opinion he doesn't want us to learn. As far as
being "vigorous has high energy level and can work
long hours without tiring," this is totally wrong. I
have been working two jobs for about a year and still
pull over time at this job when I am needed. As far as
"good judgment and common senses," how can I have
good judgment when everyday the rules are made up
as we go. As far as my "weakness to take the
opportunity to use some of my free time to cross train
on laying out orders" I don't know what Ron expects.
I can't learn that job five minutes here and five minutes
there and that's about all the free time I have.

. . .

It is my opinion that there is no communication in this
office from Ron to us. We have went to David
Meadows a number of times about Ron and the way
we are talked to and treated. I was told from all of
you, Jay, Tony and Mike, that the review should not
come as a surprise. Well this one is not a surprise but
a total shock. Why isn't that none of our weaknesses
discussed before review time. This tell [sic] me
something is badly wrong. No communication maybe.
My opinion there is no communication, no discussing
or pats on the back for anything I might do right or
wrong.

(Defendant's Exhibit #10, attachment).

On August 26, 1993 Ms. Riddle was again recommended for a pay increase of 4.0%.

Ms. Riddle conceded that in the time period preceding the evaluation she had missed a lot of time

from work. Ms. Riddle also conceded that she had no quarrel with the 1993 4.0% pay increase.

Through the cross-examination of Ms. Riddle and the introduction of the performance

reviews the defendant has clearly suggested that after her transfer to the position of data entry clerk

Ms. Riddle received the employee evaluations that were warranted by her performance and received

commensurate pay increases. With respect to the pay increase it would appear that there is no factual

basis for comparing the position of inventory control clerk and data entry clerk. It is not clear from the testimony that Ms. Pevahouse and Ms. Riddle performed their duties with equal skill. The personnel action request of Mary Pevahouse states "Mary has performed her duties well and has worked hard to train others in the office." (Plaintiff's Exhibit #64). Ms. Riddle's request for the same period is silent in the block captioned "reasons for recommendation and comments." (Defendant's Exhibit #9).

While Ms. Riddle testified that she believed herself to have been singled out by her supervisor Ron Welch there is simply no evidence that Welch was motivated by her 1984 EEOC complaint nor her 1988 law suit. Indeed the evidence in the record indicates that Ms. Riddle's dissatisfaction with Mr. Welch was shared by other employees. Her criticism of her performance evaluation was replete with references to Welch's negative impact on all employees not exclusively upon Ms. Riddle. Ms. Riddle conceded moreover that there was no direct adverse consequence from the performance reviews but for her contention of a reduced rate of pay increase with the 1992 evaluation. Ms. Riddle acknowledged the company had experienced a down turn by the time she was considered for a raise. Ms. Riddle simply has been unable to demonstrate a causal connection between the performance evaluations and her statutorily protected right to be free from retaliation.

### The Typing Course Reimbursement

Ms. Riddle testified that she attended a ten week typing course in the Fall of 1990. She paid $45 for the course. Cerro Wire's personnel director testified that reimbursement for such job related educational activity is routine. Ms. Riddle testified that she gave a copy of the certificate of completion of the course to Glenn Slovick. Ms. Riddle testified that in 1991 she had asked her

then supervisor, Glenn Slovick, whether she would be reimbursed for the fee. In that same period she also spoke with a vice-president by the name of Rackland.[46] Mr. Rackland told Ms. Riddle that she should get a copy of her certificate of completion and bring it to him. Ms. Riddle looked for the certificate and was unable to find it. She never took a copy of the certificate of Rackland after he told her how to be reimbursed.

After Mr. Joe Whittington became director of personnel in 1993, Ms. Riddle asked again about the reimbursement due her for the typing course. Mr. Whittington told her that he did not have a copy of the certificate and that there was not a copy in her file. Ms. Riddle never spoke to Mr. Whittington about reimbursement for the typing course again until after trial discovery began when a copy of the certificate of completion was found in Ms. Riddle's personnel file. The court is simply unable to find any connection between the obviously mishandled reimbursement issue and an intent to retaliate against Ms. Riddle for the filing of her complaint.

As noted above, *Donnellon v. Fruehauf Corp*, 794 F.2d at 601 acknowledges that the period of time between the filing of the discrimination complaint and the alleged discriminatory conduct is relevant to consideration of causation. In the present case, the complained of retaliatory acts occurred, at the earliest, seven years after the filing of the EEOC complaint and three years after the filing of the civil law suit. In the period 1984 through 1991 Ms. Riddle received routine performance reviews without complaint. Presumably she also received pay increases commensurate with that award to other workers. Ms. Riddle's complaints began when she began working in a new department under the direction of a supervisor for whom she clearly has little respect. While Ms. Riddle's observations concerning Mr. Welch's managerial skills may well be correct, they do not

---

[46]      The spelling of Mr. Rackland's name as set out here may be incorrect.

support the inference that Welch or any other manager or employee of Cerro Wire intentionally retaliated against Ms. Riddle for the exercise of statutorily protected rights.

After consideration of the entire record, the arguments of counsel, the briefs submitted to the court, the court concludes that Ms. Riddle has failed to establish by a preponderance of the evidence that Cerro Wire acted with a gender based discriminatory intent in the promotion of James Buck Harvell. Ms. Riddle has not sustained her burden of proof as a matter of fact that Cerro Wire or its agents or employees retaliated against her for the exercise of her statutorily protected rights.

Accordingly, judgment for the defendant will be entered.

As to the foregoing it is SO ORDERED this the 28th day of September, 1999.

PAUL W. GREENE
UNITED STATES MAGISTRATE JUDGE

68